# EXHIBIT A

FULTON COUNTY COMPLAINT and CONTRACT

**LAW OFFICE OF THOMAS J CARROLL**
Attorney for Plaintiffs
Attorney ID: 53296
Thomas J. Carroll
224 King Street
Pottstown, PA, 19464
tom@thomasjcarrolllaw.com
(610)419-6981

---

IN THE 39TH JUDICIAL DISTRICT
COURT OF COMMON PLEAS
FOR FULTON COUNTY, PENNSYLVANIA

---

| | |
|---|---|
| COUNTY OF FULTON, FULTON COUNTY BOARD OF ELECTIONS, AND STUART L. ULSH, IN HIS OFFICIAL CAPACITY AS COUNTY COMMISSIONER OF FULTON COUNTY AND IN HIS CAPACITY AS A RESIDENT, TAXPAYER AND ELECTOR IN FULTON COUNTY, AND RANDY H. BUNCH, IN HIS OFFICIAL CAPACITY AS COUNTY COMMISSIONER OF FULTON COUNTY AND IN HIS CAPACITY AS A RESIDENT, TAXPAYER AND ELECTOR OF FULTON COUNTY, | Case No. _____ <br><br> CIVIL LAW COMPLAINT <br> JURY TRIAL DEMANDED <br><br> NOTICE TO DEFENDANTS <br> You have twenty (20) days to respond to the Complaint presented herein, or a judgment may be entered against you. |
| Plaintiffs, | |
| v. | |
| DOMINION VOTING SYSTEMS, INC. and U.S. DOMINION, INC., | Attorney for Plaintiffs |
| Defendants. | |

1

<u>NOTICE</u>

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney, and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE, IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Pennsylvania Lawyer Referral Service
Pennsylvania Bar Association
100 South Street, P.O. Box 186
Harrisburg, PA 17108
(800) 692-7375

<u>COMPLAINT AND JURY DEMAND</u>

Now comes Plaintiff, Fulton County, Pennsylvania, by and through its attorneys, and for their Complaint states as follows.

<u>PARTIES</u>

1.      Plaintiff, Fulton County, Pennsylvania ("Fulton County") Board of Elections, is the governmental agency and representative of the citizens of Fulton County, Pennsylvania, and all municipalities and precincts located within its boundaries with respect to the conducting of elections within Fulton County.

2.      Fulton County's headquarters are located at 116 W. Market Street, Suite 203, McConnellburg, Pennsylvania, 17233.

3.      Upon information and belief, Defendant, Dominion Voting Systems, Inc. ("Dominion"), is a Delaware corporation with its principal place of business in Colorado, at 1201, 18th Street, Suite 210, Denver, CO, 80202.  Dominion Voting Systems Corporation is an Ontario corporation with its principal place of business in Ontario, Canada.  Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation are wholly owned subsidiaries of US Dominion, Inc., which is also a Delaware Corporation, which also has or had its principal place of business at 1201, 18th Street, Suite 210, Denver, CO, 80202.

<u>JURISDICTION AND VENUE</u>

1.      Fulton County is first party to a contract (a "Voting System and Managed Services Agreement", hereafter "Agreement") with Dominion, which

Agreement was executed for and within Fulton County, Pennsylvania, on or about August 20, 2019, for equipment and services to be provided to Fulton County. (**EXHIBIT A-1 through A-34**).[1]

2.  Defendant, Dominion Voting Systems, Inc., is second party to the Agreement with Fulton County, which Agreement, on information and belief, was signed and executed by Dominion on or about August 14, 2019.  (**EXHIBIT A-11**).

3.  Both parties to this lawsuit live, reside in, or do business in Fulton County in the State of Pennsylvania.

4.  Therefore, jurisdiction in this Court is proper.

5.  Venue is proper in the county or counties in which the act or occurrence that is the subject of this complaint took place.

6.  Therefore, venue in this Court is proper.

7.  The Agreement provides that its "[i]nterpretation of this Agreement shall be governed by the laws the Customer's State [Pennsylvania], and the courts of competent jurisdiction located in the Customer's State [Pennsylvania] will

---

[1] **EXHIBIT A** to this Complaint consists of the Managed Services Agreement entered into by and between Fulton County and Dominion on or about August 20, 2019, and the attachments to that Agreement (Exhibits A and B); a Revision (Amendment 1) entered into on or about September 15, 2019; and a subsequent revision (Amendment 2), entered into on or about February 15, 2020.  This exhibit in its entirely, is identified for ease of reference in this Complaint by an added footer: **FULTON COUNTY V. DOMINION, EXHIBIT A-1**, et seq.

have jurisdiction to hear and determine questions related to this Agreement." (**EXHIBIT A-9**).

GENERAL ALLEGATIONS

8.      In 2019, Fulton County sought to purchase voting system services and software for the running of its elections.

9.      On information and belief, Dominion held itself out as an entity that "designs, manufactures, licenses, and provides services for its voting systems." (**EXHIBIT A-1**)

10.     Fulton County thereafter entered in the Agreement with Dominion for the latter to provide "voting system services, software licenses and related services" to Fulton County for the conducting of elections held within Fulton County. *Id*.

11.     The Agreement was signed by Fulton County on or about August 20, 2019 and expires on December 31, 2026.  (**EXHIBIT A-11; EXHIBIT A-2**)

12.     In the agreement, Fulton County is referred to as the "Customer". (**EXHIBIT A-1**).

13.     On information and belief, the initial agreement contained two exhibits (Exhibits A and B), which are described therein as a "Pricing / Payment Summary and Deliverable Description" and "Software License Terms and Conditions," respectively.  *Id*.

14.     The Agreement contained several terms and conditions upon which the performance of the Agreement by Dominion was based.

15.     The Agreement defined the term "Acceptance," as applied to and by Fulton County in terms that were entirely dependent upon events and occurrences dictated by and controlled by Dominion.

16.     According to the Agreement, the term "Acceptance" was defined, in pertinent part, as

> "…successful completion by the Customer of the acceptance testing performed on each component of Dominion Hardware and Software, after delivery in accordance with testing criteria *developed and agreed to by the parties*, *or the occurrence of other events defined in Section 8*." **EXHIBIT A-1** (emphasis supplied).

17.     Section 8 of the Agreement further explained that such "testing" would only be conducted via "criteria *developed*, *updated*, and *delivered* to Customer…*by Dominion*." **EXHIBIT A-4**, ¶ 8.1 (emphasis added).

18.     The Agreement's requirement that Fulton County accept Dominion's "testing," contained a further condition that Fulton County agree to have this testing performed no later than 10 days after installation. *Id*.

19.     The Agreement goes on to state that any other testing "to the extent not tested as part of the testing pursuant to Subsection 8.1" would also be conducted according to "the Acceptance test procedures developed and updated…*by Dominion*." **EXHIBIT A-4 and A-5**, ¶ 8.2 (emphasis added).

20.     Further to this onerous, indeed, unilaterally imposed condition, Dominion gave Fulton County only 5 days to notify Dominion in writing if this *testing* of the Dominion Hardware, or the System did not "conform to user documentation *or Dominion provided Acceptance criteria*…." **EXHIBIT A-5,** ¶ 8.3 (emphasis added).

21.     A final paragraph in this "Section 8" further onerously and unilaterally provides that regardless of whether "the System, in whole or in part…*fails to conform with the specifications, requirements and functions set out in the Agreement* in a manner that does not affect the performance of the System," Fulton County "*will not refuse to grant Acceptance* of the System". *Id.*, ¶ 8.4 (emphasis added).

22.     Another section of the Agreement requires Fulton County to conduct acceptance testing "as required by Section 8." **EXHIBIT A-3,** ¶ 5.3.

23.     The Agreement defines "System" to include a combination of Dominion and non-Dominion components and integral parts, including, "the combination of Dominion Software, Dominion Hardware and EMS Hardware." **EXHIBIT A-2**, ¶ 2.8.

24.     Non-Dominion component or integral parts of the "System" include "Election Management System Hardware" or "EMS Hardware" defined further by the Agreement as "third party hardware required for operating Dominion Software as used in conjunction with the Dominion Hardware." *Id.*, ¶ 2.6.

7

25.     The Agreement contains an additional reference to "non-dominion" components or integral parts of the "System" not encompassed within the meaning of the Dominion System as defined, including, "Third Party Software," which means "*manufacturer supplied software, or firmware owned by third parties*, which Dominion provides to Customer pursuant to sublicenses or end user license agreements with the owners of such Third Party Software, Third Party Software *includes, but is not limited to, various operating systems, software drivers, report writing subroutines, and firmware*."   **EXHIBIT A-2**, ¶ 2.9 (emphasis added).

26.     With respect to such "Third Party Software," the Agreement contained a unilateral, no-choice, trigger provision that constituted "acceptance" of the "terms and conditions" of such Third Party Software "imposed by the owners of such Third Party Software" wherein Fulton County is said to have consented to the terms and conditions of the third party License Agreements "by Customer's first use of the System."  **EXHIBIT A-4**, ¶ 7.2.

27.     Fulton County is not and never has been in privity with, and has not signed or become a party to, any agreement, license, or other convention, by or with any owner of any third-party software or third-party hardware used in the Dominion System.

28.     The Agreement also contains a "Title and Risk of Loss" Section, Section 6, wherein it is provided that "[t]he System shall be provided by Dominion to the Customer as part of the managed services described herein" and

that "[t]itle to the System or any portion thereof, shall not pass to the Customer and shall remain with Dominion." **EXHIBIT A-4**, ¶ 6.1.

29.     The Agreement further provides that "Dominion Software and Third Party Software is licensed, not sold" and "[t]he original and any copies of the Dominion Software, or other software provided pursuant to this agreement, in whole or in part, including any subsequent improvements or updates, shall remain the property of Dominion, or any third party that owns such software." *Id*., ¶ 6.2.

30.     The Agreement contains a "warranties" section, Section 9, which lays out several ostensible terms and conditions respecting warranties of Dominion and non-Dominion components or integral parts of the Dominion System. **EXHIBIT A-5**.

31.     The Agreement states that the Dominion Software warranty is also subject to terms and conditions in an attached exhibit "B". *Id*., ¶ 9.1.

32.     The Agreement provides that "[t]he warranties in this Sections[sic] 9 do not apply to any third party products". **EXHIBIT A-5**, ¶ 9.2.

33.     Paragraph 9.2 further provides: "However, to the extent permitted by the manufacturers of third party products, Dominion shall pass through to Customer all warranties such manufacturers make to Dominion regarding the operation of third party products." *Id*.

34.     In the Agreement, "Dominion warrants that when used with the hardware and software configuration purchased through or approved by Dominion, each component of Dominion Hardware will be free of defects that

would prevent the Dominion Hardware from operating in conformity in all material respects with its specifications as documented by Dominion. The Dominion Hardware Warranty shall remain in effect during the Agreement Term." *Id*., ¶ 9.3.

35.    The Agreement purports to contain a "disclaimer" of warranty, which provides:

> DOMINION DISCLAIMS ALL OTHER WARRANTIES, AND REPRESENTATIONS, WHETHER WRITTEN, ORAL, EXPRESS, OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY BASED ON A COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE. [**EXHIBIT A-6**, ¶ 9.5.]

36.    The Agreement also contains a "Limitation of Liability" provision, which purports to limit Dominion's liability to 200 percent of the cost of the contract, but explicitly exempts "damages caused by Dominion's gross negligence or willful misconduct" from such limitation. **EXHIBIT A-6**, ¶ 12.

37.    Exhibit B to the Agreement (**EXHIBIT A-17 to A-20**), which further provides and defines certain information and warranties respecting Dominion Systems, including Dominion Software and other "Third-Party Products", which the Agreement defines as "any software or hardware obtained from third-party manufacturers or distributers and provided by Licensor [Dominion Voting Systems, Inc.] hereunder." **EXHIBIT A-17**, ¶ 1.6.

10

38.     Fulton County is not and never has been in privity with, and has not signed or become a party to, any agreement, license, or other convention, by or with any owner of any third-party software or third-party hardware used in the Dominion System, including any manufacturer or distributer of "Third-Party Products" as defined in the Agreement.

39.     In the Agreement, "Dominion warrants that when used with the hardware and software configuration purchased through or approved by Dominion, each component of Dominion Hardware will be *free of defects that would prevent the Dominion Hardware from operating in conformity in all material respects with its specifications as documented by Dominion*. The Dominion Hardware Warranty shall remain in effect during the Agreement Term." **EXHIBIT A-5**, ¶ 9.3 (emphasis added).

40.     The Agreement further warrants that "the Software will function substantially in accordance with the Specifications during the Term". **EXHIBIT A-19**, ¶ 7.1.

41.     In January and February of 2019, a certification report was created concerning the Dominion voting systems (Democracy Suite 5.5A with ImageCast Ballot Marking Device (ICX-BMD)), inter alia.  (**EXHIBIT B**, Certification Report Concerning Examination Results for Dominion Democracy Suite 5.5A with ImageCast Ballot Marking Device (ICX-BMD), ImageCast Precinct Optical Scanner (ICP), ImageCast Central Station (ICC), and Democracy Suite EMS (EMS) (Dominion Certification Report)).

11

42.   The Dominion Certification Report contains a Section IV entitled Conditions for Certification.  *Id*., pp. 40-50.

43.   These conditions for certification were required to be met before the voting system could be implemented.  *Id*., p. 52.

44.   The conditions included a required "final EAC certification" to be performed and approved after the initial certification, which was done in December 2018. *Id*., p. 40, ¶ A.

45.   The Dominion Certification Report provides that "[n]o components of any of the Democracy Suite 5.5A shall be connected to any modem or network interface, including the Internet, at any time, except when a standalone local area wired network configuration in which all connected devices are certified voting system components….  Any wireless access points in the district components of Democracy Suite 5.5A, including wireless LAN cards, network adapters, etc. must be uninstalled or disabled prior to delivery or upon delivery of the voting equipment to a county board of elections."  *Id*., ¶ C.

46.   On or after November 2020, Fulton County became aware of severe anomalies in the Dominion Voting Systems due to the inaccuracy and/or inability to reconcile voter data with votes actually cast and counted, i.e., tabulated, by the System in Fulton County.

47.   On or after November 2020, Fulton County became aware of certain factors and aspects of the Dominion Voting Systems that did not meet the

"conditions" for certification set forth in the January 2019 / February 2019 certification report (**EXHIBIT B**).

48.     Fulton County subsequently sought additional information pertaining to the hardware, software, and integral components and parts, of the Dominion System used in conducting its elections.

49.     In addition, Fulton County was informed of additional anomalies and problems in Dominion's "voting" systems via an expert report written by J. Alex Halderman in July 2021. (**EXHIBIT C**, the Halderman Declaration, September 21, 2021).

50.     In his declaration, Halderman described numerous security vulnerabilities in Dominion's ICX software, including flaws that would allow attackers to install malicious software on the ICX, either with temporary or physical access (such as that of voters in polling places) or remotely from election management systems.  **EXHIBIT C**, p. 1, ¶ 2.

51.     In other words, the Halderman Declaration describes that the Dominion Voting System used by Fulton County and purportedly tentatively certified in January of 2019 was vulnerable to remote internet access and did not in fact meet the Dominion Certification Report conditions as guaranteed and as warranted by Dominion, see **EXHIBIT B**, p. 40, ¶ C.

52.     At the time of that report, the author described that these vulnerabilities still existed, and could be mitigated, but that such mitigation would "take months for Dominion to assess the problems, develop responsive software

13

updates, test them, obtain any necessary approvals from the EAC and state-level certification authorities, and distribute the new software…." **EXHIBIT C**, p. 3, ¶ 3.

53.     The author further concluded that the ICX is likely to contain other, equally critical flaws, which are yet to be discovered, and that while jurisdictions might mitigate this, "[e]lection officials cannot make an informed decision about such urgent policy changes or any other mitigations until they have assessed the technical findings" in the report. *Id*., p. 3, ¶ 4.

54.     The report also notes that the ICX is set to be used in 2022 in at least parts of 16 states, including Pennsylvania, with these vulnerabilities and faults still in place.

55.     After determining that Dominion had not provided a product or a system as guaranteed and as warranted, and that fulfilled the requirements of a voting system that ensured integrity, safety, security, and accuracy in the conduction of elections and the tabulation of votes thereafter, Fulton County undertook actions to determine what remedy or remedies it might have to protect its own contractual rights and to ensure the integrity of elections so that the rights of Fulton County Citizens would not be infringed upon or otherwise compromised.

56.     Wake TSI conducted a report on February 19, 2021. (**EXHIBIT D**).

57.     Importantly, that report found, inter alia, as follows;

    a.  There were errors in the ballot scanning;

    b.   There was a failure of Dominion Voting to meet Commonwealth Certification requirements;

    c.   There were non-certified database tools installed on the Dominion Voting System;

    d.   There were changes made to EMS three weeks before the 2020 election; and

    e.   There was a lack of commonwealth L&A inspections of the Dominion Voting Systems. *Id*., p. 5.

58.    As the Wake TSI Report pointed out, the Commonwealth required the Pennsylvania Department of State (DOS) to perform and collect the L&A testing results. *Id*.

59.    In mid-2021, the Secretary of the Commonwealth subsequently "decertified" the Dominion Voting System machines in Fulton County, purportedly because Fulton County had used "a third-party consultant" to inspect its electronic voting devices as part of Fulton County's inquiry into the integrity of the system's performance during the 2020 election.

60.    On or about August 18, 2021, Fulton County sued the Secretary of the Commonwealth challenging the Secretary's decertification of Dominion's voting machines.  Case No. 277 MD 2021.

61.    Fulton County filed an amended petition on September 17, 2021.

62.    Fulton County's lawsuit contained five counts: (1) the Secretary unlawfully decertified Fulton County's two electronic voting machines; (2) the Pennsylvania Election Code (Election Code) expressly authorized the County to inspect its electronic voting devices as part of its statutory duty to ensure the safe

and honest conduct of elections in the County; (3) a directive of the Secretary, which purported to prohibit all county boards of elections from inspecting their electronic voting devices with the assistance of a third-party consultant, violated Section 302 of the Election Code, 25 P.S. §2642; (4) the Secretary unlawfully withheld funding from the County that it needs to acquire replacement electronic voting devices; and (5) a request for injunctive relief to restore the status quo that existed prior to the Secretary's unlawful decertification of the county's voting machines.

63.   On or about January 1,2022, Fulton County subsequently stopped using Dominion Voting Systems and contracted with another provider.

64.   On or about January 3, 2022, Dominion sought to "intervene", claiming that it was intervening "*for the limited purpose of securing a protective order to enforce the terms of its contract*" with Fulton County.

65.   Dominion did not file a counter-claim or cross-claim, or otherwise file any affirmative pleadings in these proceedings containing legal claims as against any other party.

66.   Further after it stopped using Dominion, and further to its due diligence in protecting its contractual and legal rights and that of its citizens, on September 15, 2022, a commissioned report revealed several deficiencies and the absence of information and data that directly implicated and contradicted the contractual terms, conditions, promises, and warranties provided to Fulton County by Dominion in the Agreement and the conditions required for

16

certification in the Dominion Certification Report. (**EXHIBIT E**, Speckin Forensics, LLC, September 2022 Report).

67.     The September Report reveals the results of analysis performed on six hard drives in Fulton County, which images were created in July 2022. (*Id*., p. 1).

68.     The September Report revealed that contrary to the terms of the Agreement, "security measures necessary to harden and secure" the Dominion machines was not completed; showing the last update or security patch to have been performed in April 2019. *Id*., p. 1.

69.     The September Report showed that external USB hard drives had been inserted in the machines on several occasions, and that there is no known list of approved external drives that could have been or were used or inserted into the machines. *Id*., p. 2, ¶ 2.  In this regard, the report concluded that there was no way to determine whether and to what extent these unauthorized drives compromised the data or the system. *Id*.

70.     The September Report further concluded that there had been "substantial changes" to the drives as seen with the inclusion of over 900 .dll files and links created since the date of installation of the Dominion software and these pathways constituted a security breach due to the introduction of an unauthorized "script" into the Dominion voting systems used in Fulton County. *Id*., ¶ 3.

71.     The September Report found that a "python script" had been installed *after the certification date* of the system" and not only should such a script not have been added to the system, but "[t]his python script can exploit and create

17

any number of vulnerabilities including, external access to the system, data export of the tabulations, or introduction of other metrics not part of or allowed by the certification process." *Id.*, ¶ 5.   Among other findings, this constituted a direct violation of and failure of the conditions required for certification in the Dominion Certification Report, see **EXHIBIT B**, pp. 40-50.

72.   Each of the drives are "interconnected in a system to one another" and that this would be required to share data and counts between devices. *Id.*, ¶ 6. However, "[b]ecause of this networking, unauthorized access [to] any one device, allowed unauthorized access to any device connected to the network of devices." *Id*.  Among other findings, this constituted a direct violation of and failure of the conditions required for certification in the Dominion Certification Report, see **EXHIBIT B**, pp. 40-50, ¶ C.

73.   The September Report further determined that "[a]n external IP address that is associated with Canada is found on the Adjudication01 [workstation]" and "[t]his shows that at least one of the network devices has connected to an external device on an external network" and that this was the same device that the post-certification python script was found on. *Id.*, ¶ 7. Among other findings, this constituted a direct violation of and failure of the conditions required for certification in the Dominion Certification Report, see **EXHIBIT B**, pp. 40-50, ¶ C.

74.   The log files for the Adjudication device showed an IP address of 172.102.16.22, which derives from a location in Quebec, Canada and that this

revealed a serious issue to be connected remotely to a Canadian system. *Id*. at p. 4. The report cannot determine when this connection occurred nor what data was transmitted, but this remote access did occur. *Id*. Among other findings, this constituted a direct violation of and failure of the conditions required for certification in the Dominion Certification Report, see **EXHIBIT B**, pp. 40-50, ¶ C.

75.     The machines and devices only had Windows Defender dating to July 2016 and that no other updates had been made. *Id*., p. 3. The report concluded that "viruses or malicious software" created after that date would not be combated by the systems without proper updates. *Id*. Among other findings, this constituted a direct violation of and failure of the conditions required for certification in the Dominion Certification Report, see **EXHIBIT B**, pp. 40-50.

76.     The September Report findings confirmed that many of the "conditions" in the certification report which were required to be met for certification were not met and were not present before, during and after the November 2020 election and up to the present. Among other findings, this constituted a direct violation of and failure of the conditions required for certification in the Dominion Certification Report, see **EXHIBIT B**, pp. 40-50.

77.     In addition to the facts alleged herein, to wit, that Dominion Voting Systems products did not function correctly, had faults and defects, and did not meet conditions required during and after the November 2020 election in Fulton County, and in addition to the aforementioned analyses, described herein, Fulton

County has become aware of additional information demonstrating the existence of anomalies, defects, and faults in the Dominion Voting Systems products before, during and after the November 2020 election.

78.    On March 31, 2022, the United States Election Assistance Commission (EAC) conducted an investigation and issued a report (the EAC Report).  (**EXHIBIT F**, EAC Report of Investigation, March 31, 2022).

79.    The EAC Report concerned an investigation performed on Dominion Voting Systems used during a municipal election held in October 2021 in Williamson County, Tennessee.  *Id*., p. 2.

80.    The EAC Report concluded that 7 out of a total of 18 image cast precinct (ICP) tabulators used during the election "did not match the number of ballots scanned."  *Id*.   This anomaly was confirmed and reproduced during investigation, but "the root cause of the anomaly was not determined."  *Id*., p. 3.

81.    The EAC Report further discovered that the Dominion Voting System "was installed with outdated versions of two configuration files when the system was upgraded…."  *Id*., p. 3.

82.    The EAC Report noted that "[b]allots were printed from the ICX and tabulated through the ICP scanners. Multiple ICP scanners were used for tabulation including some that originally exhibited the anomaly during the election and some that did not.  Following tabulation, close poll reports and audit logs from the ICP scanners were examined.  Results showed that the anomaly *was recreated on each of the ICP scanners*. This process was repeated several

times to understand and isolate the details of exactly when the anomaly occurred and circumstances that may have led to the anomaly occurring." *Id*.

83. The EAC Report further concluded that "[a]nalysis of audit log information revealed entries that coincided with the manifestation of the 'anomaly; a security error 'QR code signature mismatch' and a warning message 'Ballot format or id is unrecognizable' indicating a QR code misread occurred. When these events were logged, the ballot was rejected. Subsequent resetting of the ICP scanners and additional tabulation demonstrated that each instance of the anomaly coincided with the previously mentioned audit log entries, though not every instance of those audit log entries resulted in the anomaly." *Id*.

84. The EAC Report concluded that once the anomaly was triggered, "ballots successfully scanned and tabulated by the ICP were not reflected in the close poll reports on the affected ICP scanners." *Id*., pp. 3-4.

85. The EAC Report further noted that "[o]n February 11, 2022, Dominion submitted a Root Cause Analysis (RCA) to the EAC. The report indicates that erroneous code is present in the EAC certified D-Suite 5.5-B and D-Suite 5.5-C systems. The RCA report states that when the anomaly occurs, it's due to a misread of the QR code. If the QR code misread affects a certain part of the QR code, the ICP scanner mistakenly interprets a bit in the code that marks the ballot as provisional. Once that misread happens, the provisional flag is not properly reset after that ballot's voting session. The result is that every ballot

21

scanned and tabulated by the machine after that misread is marked as provisional and thus, not included in the tabulator's close poll report totals."

86.    As alleged in this Complaint, and as demonstrated by these aforementioned allegations and the reports and analyses conducted and discussed herein, Dominion required in its contract that Fulton County (and whatever party contracted to use their machines), accept its certification and testing parameters, where Dominion was largely responsible for ensuring that Dominion Voting Machine Systems passed certification requirements and logic and accuracy testing, and Dominion Voting Machines did not meet the conditions required for basic certification and testing sufficient to ensure the integrity of the elections for the citizens of Fulton County.

## COUNT I – BREACH OF CONTRACT

87.    To establish an action for breach of contract, a party must demonstrate the existence of a contract, a breach of a duty imposed by the contract, and damages. *J.F. Walker Co. v. Excalibur Oil Group, Inc.*, 2002 PA Super 39, 792 A.2d 1269, 1272 (Pa. Super. 2002).

88.    The Agreement between Fulton County and Dominion constituted a contract whereby for consideration and according to the schedule of payments and its terms, Fulton County paid Dominion to provide equipment and services.

89.    Under the Agreement, Dominion had a duty to, inter alia, ensure that the System was secure and compliant, and in a condition fit for use and purpose

and the service it was held out to provide to Fulton County ("voting system services, software licenses and related services"), in consideration for Fulton County's signing onto the terms and conditions of the Agreement. (**EXHIBIT A-1**).

90.     Sufficient product delivery and services were dependent on successful completion of the acceptance testing and the failure of the conditions to certification described above constituted a failure in and impossibility of the Acceptance provision in the Agreement.  **EXHIBIT A-1, A-4**, ¶ 8.1.

91.     Acceptance terms in the Agreement that made it impossible for Fulton County to refuse to grant Acceptance based on a failure of the System to conform with the specifications, requirements and functions set out in the Agreement were onerous and against public policy, and in any event constituted a breach of Dominion's obligations to provide "voting system services, software licenses and related services" fit for use and purpose as promised and held out to Fulton County by Dominion.

92.     Prior reports, including the Wake TSI Report (**EXHIBIT D**) and the September Report (**EXHIBIT E**) confirmed that many of the "conditions" in the certification report which were required to be met for certification and proper functioning of the Dominion Voting System were not met and were not present before, during and after the November 2020 election and up until the time Fulton County ceased using the Dominion Voting System.  See, **EXHIBIT B**, pp. 40-50

23

93.     Based on information and belief and the allegations herein, Dominion breached that part of the Agreement in which warranted that when used with the hardware and software configuration purchased through or approved by Dominion, each component of Dominion Hardware would be free of defects that would prevent the Dominion Hardware from operating in conformity in all material respects with its specifications as documented by Dominion." **EXHIBIT A-5**, ¶ 9.3.

94.     Dominion breached this duty because it failed to provide a system that was free from defects and compliant.

95.     As a result of Dominion's breach, Fulton County (and Fulton County's citizens) suffered damages including, the inability to ensure compliance with the requirements of state and federal law, and the constitutional rights of Fulton County's voters.

96.     As a result of Dominion's breach, Fulton County (and Fulton County's citizens) suffered damages, including capital outlay and expenditures that were borne by Fulton County citizen taxpayers, which outlay and expenditures were made in consideration and reliance upon a voting system that did not maintain and ensure the integrity and sanctity of the voting process and protect and preserve the constitutional rights of all Fulton County citizens.

## COUNT II – BREACH OF WARRANTY

97.    Based on information and belief and the allegations herein, Dominion breached that part of the Agreement in which warranted that when used with the hardware and software configuration purchased through or approved by Dominion, each component of Dominion Hardware would be free of defects that would prevent the Dominion Hardware from operating in conformity in all material respects with its specifications as documented by Dominion." **EXHIBIT A-5**, ¶ 9.3.

98.    Dominion breached this duty because it failed to provide a system that was free from defects and compliant.

99.    As a result of Dominion's breach, Fulton County (and Fulton County's constituents) suffered damages including, the inability to ensure compliance with the requirements of state and federal law, and the constitutional rights of Fulton County's voters.

100.    As a result of Dominion's breach, Fulton County (and Fulton County's citizens) suffered damages including, the inability to ensure compliance with the requirements of state and federal law, and the constitutional rights of Fulton County's voters.

101.    As a result of Dominion's breach, Fulton County (and Fulton County's citizens) suffered damages, including capital outlay and expenditures that were borne by Fulton County citizen taxpayers, which outlay and

expenditures were made in consideration and reliance upon a voting system that did not maintain and ensure the integrity and sanctity of the voting process and protect and preserve the constitutional rights of all Fulton County citizens.

<u>RELIEF REQUESTED</u>

WHEREFORE, as alleged in this Complaint, and Fulton County claims breach of contract and breach of warranty, and breach of other common-law and statutory duties, by Dominion, which entitles Fulton County to Damages as alleged herein, including, but not limited to all fees, expenditures and costs made in reliance upon and in consideration for the provision by Dominion of a serviceable product that was fit for its intended purpose and use.

WHEREFORE, Fulton County reserves the right to amend this Complaint to add allegations and claims and parties that Fulton County may become aware of through the ordinary course of this litigation and/or through additional discovery.

WHEREFORE, Fulton County prays that this Court enter judgment against Dominion on the claims and counts herein presented, and award any other damages, including costs and attorneys fees, which justice requires.

Respectfully submitted,

Thomas J. Carroll
Attorney ID: 53296
Attorney for Plaintiffs
LAW OFFICE OF
THOMAS J CARROLL
224 King Street
Pottstown, PA, 19464
(610)419-6981
tom@thomasjcarrolllaw.com

Date: September 20, 2022

<u>VERIFICATION</u>

I, <u>Thomas J. Carroll, Esquire,</u> hereby verify that I represent Plaintiffs, Fulton County, in this action and that the statements made in the foregoing pleadings are true and correct to the best of my knowledge, information, and belief.  The undersigned understands that the statements therein are made subject to the penalties of 18 Pa. C.S. section 4904 relating to unsworn falsification to authorities.

_____
THOMAS J. CARROLL


 Date:  September 20, 2022

28

<u>CERTIFICATE OF SERVICE</u>

I, Thomas J. Carroll, hereby certify that a true and correct copy of the foregoing document was served upon or sent to the following via First Class Mail to Dominion Voting Systems, Inc. and U.S. Dominion, Inc., 1201, 18th Street, Suite 210, Denver, CO, 80202.


_____

THOMAS J. CARROLL


Date:  September 20, 2022

# Exhibit A

## Managed Services Agreement Between Fulton County and Dominion,

## August 20, 2019

VOTING SYSTEM AND MANAGED SERVICES AGREEMENT
BY AND BETWEEN
DOMINION VOTING SYSTEMS, INC.
AND FULTON COUNTY, PA

This Managed Services Agreement (the "Agreement"), dated April 1, 2019 (the "Effective Date"), for a voting system services, software licenses and related services is made by and between Fulton County, PA, having its principal office located at 116 W. Market Street, Suite 203 McConnellburg, PA 17233 (hereinafter the "Customer"), and Dominion Voting Systems Inc., having its principal office located at 1201 18th Street, Suite 210, Denver, CO 80202 (hereinafter "Dominion"). This Agreement may refer to Dominion and the Customer together as the "Parties," or may refer to Dominion or the Customer individually as a "Party."

WHEREAS, the Customer desires to purchase voting system services, and software use licenses; and

WHEREAS, Dominion designs, manufactures, licenses, and provides services for its voting systems.

NOW THEREFORE, in consideration of the mutual covenants contained herein, and in accordance with the terms and conditions set forth herein, Dominion agrees to license and furnish the System (as defined herein) to the Customer.

1. **Composition of Agreement.** Exhibits A and B are attached and incorporated herein by reference and form a part of this Agreement. This Agreement consists of the terms and conditions contained in the following sections and the listed Exhibits:

   | Exhibit A: | Pricing/Payment Summary and Deliverables Description |
   | Exhibit B: | Software License Terms and Conditions |

2. **Definitions.** For the purposes of this Agreement, the following are defined terms:

   2.1. "Acceptance" and variations thereof, means the successful completion by the Customer of the acceptance testing performed on each component of Dominion Hardware and Software, after delivery in accordance with testing criteria developed and agreed to by the parties, or the occurrence of other events defined in Section 8.

   2.2 "Confidential Information" means those materials, documents, data, and technical information, specifications, business information, customer information, or other information of a Party (the "Disclosing Party") maintains as trade secrets or confidential and which are disclosed to a another Party (the "Receiving Party") in tangible form conspicuously marked as "confidential," or with words having similar meaning, which includes without limitation, Dominion Software and associated documentation.

   2.3. "Dominion Hardware" means the ImageCast® system hardware as more specifically described in Exhibit A.

FULTON COUNTY V. DOMINION, EXHIBIT A-1

2.4.   "Dominion Software" means software and firmware programs licensed to the Customer by Dominion and any associated documentation as more specifically described in Exhibit A.

2.5.   "Election" means a single election event administered by the Customer including any absentee and early voting activity associated with the election event. Election shall not mean any follow-on events occurring after the initial election event, including without limitations, run-offs or recall replacements elections. Any follow on event shall be considered an Election in and of itself.

2.6.   "Election Management System Hardware" or "EMS Hardware" means third party hardware required for operating Dominion Software as used in conjunction with the Dominion Hardware.

2.7.   "License" has the meaning set forth in Section 7.

2.8.   "System" means the combination of Dominion Software, Dominion Hardware and EMS Hardware.

2.9.   "Third Party Software" means manufacturer supplied software, or firmware owned by third parties, which Dominion provides to Customer pursuant to sublicenses or end user license agreements with the owners of such Third Party Software. Third Party Software includes, but is not limited to, various operating systems, software drivers, report writing subroutines, and firmware.

3.   **Term of Agreement.** The Term of this Agreement shall begin on the Effective Date and shall continue until December 31, 2026, unless sooner terminated or extended as provided herein.

4.   **Dominion's Responsibilities.** Dominion shall:

4.1.   Deliver the System and services as described in Exhibit A - Pricing and Payment Summary and Deliverables Description.

4.2.   Provide the Customer with a Dominion Software use License as described in Exhibit B - Software License Terms.

4.3.   Assign a Dominion project manager ("Dominion Project Manager") to oversee the general operations of the project. The Dominion Project Manager will be the primary contact for all project needs. The Dominion Project Manager will be responsible for all deliverables and services including, resource planning and coordination, product delivery, issue resolution and for all administrative matters such as invoices and payments.

4.4.   Assist in the Acceptance testing process as required by Section 8 herein.

FULTON COUNTY V. DOMINION, EXHIBIT A-2

4.5.    Provide Customer with one (1) reproducible electronic copy of the documentation.

4.6.    Provide invoices to Customer pursuant to the payment schedule in Exhibit A and the payment terms described in Section 5.1 herein.

**5.    Customer's Responsibilities.** Customer shall:

5.1.    Pay invoices in a timely manner and no later than thirty (30) calendar days from receipt of a Dominion invoice.

      5.1.1.    Dominion shall issue invoices to Customer pursuant to the invoice schedule listed in Exhibit A.

      5.1.2.    Payments specified in this Section 5 are exclusive of all excise, sale, use and other taxes imposed by any governmental authority, all of which shall be reimbursed by the Customer. If the Customer is exempt from taxes, Customer shall supply Dominion a tax exemption certificate or other similar form demonstrating its exempt status.

5.2.    Assign a Customer project manager ("Customer Project Manager"), who shall be responsible for review, analysis and acceptance of the System and the coordination of Customer personnel, equipment, vehicles and facilities. The Customer Project Manager shall be empowered to make decisions on behalf of the Customer with respect to the work being performed under this Agreement. The Customer Project Manager shall also have direct access to the Customer's top management at all times for purposes of problem resolution.

5.3.    Conduct Acceptance testing process as required by Section 8.

5.4    Customer shall provide reasonable access and entry into all Customer property required by Dominion to perform the services described in this Agreement. All such access and entry shall be provided at Customer's expense.

5.5    When applicable, for election setup and database creation services as described in Exhibit A, the Customer shall review and approve or identify issues to all Dominion deliverables related to such service within two (2) business days of receipt by the Customer. In the event the Customer discovers an issue, it shall provide written notice to Dominion immediately following the discovery of any issue and Dominion shall rectify the issue at no additional cost to the Customer. In the event the Customer approves the deliverable and subsequent to such approval, request that a change be made to the deliverable, then Dominion may provide the change at an additional cost based upon Dominion's then current published service rates.

FULTON COUNTY V. DOMINION, EXHIBIT A-3

6.    **Title and Risk of Loss.**

6.1.    <u>Title to the System.</u> The System shall be provided by Dominion to the Customer as part of the managed services described herein.  Title to the System or any portion thereof, shall not pass to the Customer and shall remain with Dominion.

6.2.    <u>Software.</u> Dominion Software and Third Party Software is licensed, not sold. The original and any copies of the Dominion Software, or other software provided pursuant to this agreement, in whole or in part, including any subsequent improvements or updates, shall remain the property of Dominion, or any third party that owns such software.

6.3.    <u>Risk of Loss.</u> Dominion shall bear the responsibility for all risk of physical loss or damage to each portion of the System until such portion is delivered to the Customer. Customer shall provide Dominion with a single location for shipment and Dominion shall not be responsible for shipping to more than one location.  To retain the benefit of this clause, Customer shall notify Dominion of any loss or damage within ten (10) business days of the receipt of any or all portions of the System, or such shorter period as may be required to comply with the claims requirements of the shipper, and shall cooperate in the processing of any claims made by Dominion.

7.    **Software License and Use.**

7.1.    <u>License.</u> Upon mutual execution of this Agreement, Dominion grants to the Customer, and the Customer accepts a non-exclusive, non-transferable, license ("License") to use the Dominion Software subject to the terms and conditions of this Agreement and the Software License Terms attached hereto as Exhibit B.

7.2.    <u>Third Party Software.</u> The System includes Third Party Software, the use of which is subject to the terms and conditions imposed by the owners of such Third Party Software.  Customer consents to the terms and conditions of the third party License Agreements by Customer's first use of the System.

8.    **Acceptance.**

8.1.    <u>Dominion Software or Dominion Hardware Testing.</u> After delivery of Dominion Software or Dominion Hardware, the Customer will conduct Acceptance testing of such units, in accordance with the Acceptance criteria developed, updated, and delivered to Customer in writing, from time to time, by Dominion. Such Acceptance testing shall occur at a time mutually agreed upon by the Parties, but no later than ten (10) business days after installation.

8.2.    <u>System Acceptance Testing.</u> To the extent not tested as part of the testing pursuant to Subsections 8.1, upon completing the installation of the System, the Customer

will conduct system acceptance testing, according to the Acceptance test procedures developed and updated, from time to time, by Dominion. Such Acceptance testing shall occur at a time mutually agreed upon by the Parties, but no later than ten (10) business days after installation of the System.

8.3.   Acceptance/Rejection.   After testing, if the Dominion Software, Dominion Hardware, or the System does not conform to user documentation or Dominion provided Acceptance criteria, Customer will notify Dominion in writing within five (5) business days.   Dominion will, at its own expense, repair or replace the rejected Dominion Software, Dominion Hardware, or System within thirty (30) days after receipt of Customer's notice of deficiency.   The foregoing procedure will be repeated until Customer finally accepts or rejects the Dominion Software, Dominion Hardware, or System in writing in its sole discretion.

8.4   System Conformance.  Customer will not refuse to grant Acceptance of the System, in whole or in part, solely for the reason that it fails to conform with the specifications, requirements and functions set out in the Agreement in a manner that does not affect the performance of the System, in whole or in part.  In such instance of non-conformity, Dominion shall provide a plan of action to cure such non-conformity with reasonable dispatch.

## 9.   Warranties.

9.1.   Dominion Software Warranty.  The Dominion Software warranty is subject to the terms and conditions of Exhibit B - the Software License Terms.

9.2.   Third Party Products. The warranties in this Sections 9 do not apply to any third party products.  However, to the extent permitted by the manufacturers of third party products, Dominion shall pass through to Customer all warranties such manufacturers make to Dominion regarding the operation of third party products.

9.3.   Dominion Hardware Warranty Terms. Dominion warrants that when used with the hardware and software configuration purchased through or approved by Dominion, each component of Dominion Hardware will be free of defects that would prevent the Dominion Hardware from operating in conformity in all material respects with its specifications as documented by Dominion. The Dominion Hardware Warranty shall remain in effect during the Agreement Term.

9.4.   Dominion Hardware Warranty Services. If any Dominion Hardware component fails to operate in conformity with its specifications during the warranty period, Dominion shall provide a replacement for the Dominion Hardware component or, at Dominion's sole option, shall repair the Dominion Hardware component, so long as the Dominion Hardware is operated with its designated Dominion Software and with third party products approved by Dominion for use with the Dominion Hardware.  The following conditions apply to the Dominion Hardware warranty:

FULTON COUNTY V. DOMINION, EXHIBIT A-5

9.4.1.     Customer shall bear the shipping costs to return the malfunctioning component of Dominion Hardware to Dominion, and Dominion shall bear the costs for standard shipping of the repaired or replaced component of Dominion Hardware to Customer.

9.4.2.     The following services are not covered by this Agreement, but may be available at Dominion's current time and material rates:

     9.4.2.1.     Replacement of consumable items including but not limited to batteries, paper cards, ribbons, seals, smart cards, and removable memory devices, scanner rollers, disks, etc.;

     9.4.2.2.     Repair or replacement of Dominion Hardware damaged by accident, disaster, theft, vandalism, neglect, abuse, or any improper usage;

     9.4.2.3.     Repair or replacement of Dominion Hardware modified by any person other than those authorized in writing by Dominion;

     9.4.2.4.     Repair or replacement of Dominion Hardware from which the serial numbers have been removed, defaced or changed.

9.5.     <u>No Other Warranties.</u> DOMINION DISCLAIMS ALL OTHER WARRANTIES, AND REPRESENTATIONS, WHETHER WRITTEN, ORAL, EXPRESS, OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY BASED ON A COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

**10. Force Majeure.** Should any circumstances beyond the control of Dominion or Customer occur that delay or render impossible the performance of any obligation due under this Agreement, such obligation will be postponed for the period of any delay resulting from any such circumstances, plus a reasonable period to accommodate adjustment to such extension, or cancelled if performance has been rendered impossible thereby. Such events may include, without limitation, accidents; war, acts of terrorism; natural disasters; labor disputes; acts, laws, rules or regulations of any government or government agency; or other events beyond the control of both Dominion and Customer. Neither Party shall be liable under this Agreement for any loss or damage to the other Party due to such delay or performance failures. Notwithstanding the foregoing, both Parties shall use their commercially reasonable efforts to minimize the adverse consequences of any such circumstances. This Section shall not operate to excuse any Party from paying amounts that are owed pursuant to this Agreement.

**11. Indemnification.** Dominion, at its sole expense, will indemnify and defend the Customer, its officers, agents and employees from and against any loss, cost, expense or liability (including but not limited to attorney's fees and awarded damages) arising out of a claim, suit or action that the System infringes, violates, or misappropriates a Third Party's patent, copyright, trademark, trade secret or other intellectual property or proprietary rights.

FULTON COUNTY V. DOMINION, EXHIBIT A-6

**12. Limitation of Liability.** DOMINION'S TOTAL AGGREGATE LIABILITY FOR ANY LOSS, DAMAGE, COSTS OR EXPENSES UNDER OR IN CONNECTION WITH THIS AGREEMENT, HOWSOEVER ARISING, INCLUDING WITHOUT LIMITATION, LOSS, DAMAGE, COSTS OR EXPENSES CAUSED BY BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY, BREACH OF STATUTORY OR ANY OTHER DUTY SHALL IN NO CIRCUMSTANCES EXCEED 200% OF THE TOTAL DOLLAR AMOUNT OF THE AGREEMENT.  NEITHER PARTY SHALL BE LIABLE FOR ANY LOSS OF PROFITS, LOSS OF BUSINESS, LOSS OF DATA, LOSS OF USE OR ANY OTHER INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL LOSS OR DAMAGE WHATSOEVER, HOWSOEVER ARISING, INCURRED BY THE OTHER PARTY OR ANY THIRD PARTY, WHETHER IN AN ACTION IN CONTRACT, NEGLIGENCE OR OTHER TORT, EVEN IF THE PARTIES OR THEIR REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANYTHING IN THE AGREEMENT TO THE CONTRARY, THIS SECTION DOES NOT LIMIT (1) THE INDEMNIFICATION OBLIGATION UNDER SECTION 11, (2) DAMAGES CAUSED BY DOMINION'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

**13. Confidential Information.**

13.1.   Each Party shall treat the other Party's Confidential Information as confidential within their respective organizations and each Party shall be given the ability to defend the confidentiality of its Confidential Information to the maximum extent allowable under the law prior to disclosure by the other Party of such Confidential Information.

13.2.   Subject to the requirements of the Customer's public record laws ("PRL"), neither Party shall disclose the other Party's Confidential Information to any person outside their respective organizations unless disclosure is made in response to, or because of, an obligation to any federal, state, or local governmental agency or court with appropriate jurisdiction, or to any person properly seeking discovery before any such agency or court.

13.3.   Any specific information that Dominion claims to be confidential must be clearly marked or identified as such by the Customer. To the extent consistent with PRL, Customer shall maintain the confidentiality of all such information marked by Dominion as confidential. If a request is made to view such Confidential Information, Customer will notify Dominion of such request and the date the information will be released to the requestor unless Dominion obtains a court order enjoining such disclosure. If Dominion fails to obtain such court order enjoining such disclosure, the Customer will release the requested information on the date specified. Such release shall be deemed to have been made with Dominion's consent and shall not be deemed to be a violation of law or this Agreement.

**14. Assignment.** Neither Party may assign its rights, obligations, or interests in this Agreement without the written consent of the other Party, providing however that Dominion may assign the

proceeds of this Agreement to a financial institution without prior consent of the Customer but with written notice to Customer.

**15.    Termination.**

15.1    <u>For Default.</u>    In the event either Party violates any provisions of this Agreement, the non-violating Party may serve written notice upon the violating Party identifying the violation and a providing a reasonable cure period. Except as otherwise noted herein, such cure period shall be at least thirty (30) days. In the event the violating Party has not remedied the infraction at the end of the cure period, the non-violating Party may serve written notice upon the violating Party of termination, and seek legal remedies for breach of contract as allowed hereunder. If the breach identified in the notice cannot be completely cured within the specified time period, no default shall occur if the Party receiving the notice begins curative action within the specified time period and thereafter proceeds with reasonable diligence and in good faith to cure the breach as soon as practicable.

15.2    <u>For Non-Appropriation of Funds.</u>    The Customer shall not be obligated for payments hereunder for any future fiscal year unless or until the Customer appropriates funds for this Agreement in Customer's budget for that fiscal year.  In the event that funds are not appropriated, then this Agreement may be terminated by the Customer as the end of the last fiscal year for which funds were appropriated. Termination of this Agreement by the Customer under this Section 15.2 shall not constitute a breach of this Agreement by the Customer.  Customer shall notify Dominion in writing of such non-appropriation at the earliest possible date which, in any event, shall be prior to Dominion performing services during any fiscal year for which an appropriation has not been made.  In the event Customer notifies Dominion that sufficient funds have not been appropriated, or if in fact sufficient funds have not been appropriated, to compensate Dominion in accordance with this Agreement, Dominion may suspend Dominion's performance and terminate all Dominion licenses under this Agreement. Suspension of performance and termination of all Dominion licenses by Dominion in accordance with this section 15.2 shall not constitute a breach of this Agreement by Dominion.

15.3    <u>For Non-Certification of the Voting System.</u>    In the event that Dominion does not achieve State of Pennsylvania voting system certification for the System provided to the Customer as part of this Agreement (as more specifically described in Exhibit A) by June 30 2019, then the Customer may terminate this Agreement at will. Should the Agreement be terminated pursuant to this Section 15.3, Dominion shall refund all payments made by the Customer.  In addition, Dominion shall pay for all costs associated with retrieving the System from the Customer.

**16.    Legality and Severability.** This Agreement and the Parties' actions under this Agreement shall comply with all applicable federal, state and local laws, ordinances, rules, regulations, court orders, and applicable governmental agency orders. If any term or provision of this Agreement is held to be illegal or unenforceable, the remainder of this Agreement shall not be affected thereby

FULTON COUNTY V. DOMINION, EXHIBIT A-8

and each term or provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. The Parties agree that any court reviewing this Agreement shall reform any illegal or unenforceable provision to carry out the express intent of the parties as set forth herein to the fullest extent permitted by law.

**17.    Survival.** The provisions of Sections 2, 9, 10, 11, 13, 16, 18, and 19 shall survive the expiration or termination of this Agreement.

**18.    Choice of Law.** Interpretation of this Agreement shall be governed by the laws of the Customer's State, and the courts of competent jurisdiction located in the Customer's State will have jurisdiction to hear and determine questions relating to this Agreement.

**19.    Waiver.** Any failure of a Party to assert any right under this Agreement shall not constitute a waiver or a termination of that right or any provisions of this Agreement.

**20.    Independent Contractor.** Dominion and its agents and employees are independent contractors performing professional services for the Customer and are not employees of the Customer. Dominion and its agents and employees shall not accrue leave, retirement, insurance, bonding, use of Customer vehicles, or any other benefits afforded to employees of the Customer as a result of this Agreement. Dominion acknowledges that all sums received hereunder are personally reportable by it for income tax purposes as self-employment or business income and are reportable for self-employment tax.

**21.    Notices.** All notices required or permitted to be given hereunder shall be given in writing and shall be deemed to have been given when personally delivered or by nationally recognized overnight carrier or mailed, certified or registered mail, return receipt requested, addressed to the intended recipient as follows:

If to Dominion:

> Dominion Voting Systems, Inc.
> Attn: Contracts Administrator
> 1201 18th St., Ste. 210
> Denver, CO 80202

If to the Customer:

> Fulton County ~~Director of~~ Elections & Voter Registration
> ~~Attn: Karen Hann~~
> 116 W. Market Street, Suite 203
> McConnellburg, PA  17233

**22.    Entire Agreement.** This Agreement and its Exhibits incorporated herein by reference constitute the entire agreement, understanding and representations between Dominion and the Customer, and supersede and replace all prior agreements, written or oral. No modifications or representations to the Agreement shall be valid unless made in writing and signed by duly authorized representatives of both the Customer and Dominion, and incorporated as an Addendum hereto.

FULTON COUNTY V. DOMINION, EXHIBIT A-9

**23.   Third-Party Beneficiary**. No person shall be a third-party beneficiary pursuant to this Agreement. No obligation of Dominion or Customer may be enforced against Dominion or Customer, as applicable, by any person not a party to this Agreement.

*Signature Page Follows*

FULTON COUNTY V. DOMINION, EXHIBIT A-10

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

**DOMINION VOTING SYSTEMS, INC.**

_____
AUTHORIZED SIGNATURE

John Poulos
PRINTED NAME

President & CEO
TITLE

8/14/2019
DATE

**FULTON COUNTY, PA**

Stuart L Ulsh
AUTHORIZED SIGNATURE

Stuart L Ulsh
PRINTED NAME

Commissioner   Chair
TITLE

8/20/19
DATE

FULTON COUNTY V. DOMINION, EXHIBIT A-11

**EXHIBIT A**
VOTING SYSTEM AGREEMENT
BY AND BETWEEN DOMINION VOTING SYSTEMS
AND FULTON COUNTY, PA

**PRICING SUMMARY AND DELIVERABLES DESCRIPTION**

1. <u>Pricing/Payment Summary and Descriptions</u>

    1.1 **Pricing and Payment Summary**. The total annual managed service contract pricing shall equal **$31,931.00/year** for a total of eight (8) years. The following is the invoicing schedule for the annual Customer payments.  The Customer shall pay invoices in a timely manner and no later than thirty (30) calendar days from receipt of a Dominion invoice. All payments shall be made is in U.S. Dollars.  Pricing does not include shipping or any applicable taxes.

    1.1.1 Year 1 shall cover the time period from the Agreement Effective Date through December 31, 2019. The Year 1 invoice of **$31,931.00** will be issued immediately after System certification by the State of Pennsylvania.  Under no circumstance will payment be made by the Customer until the System is certified for use by the State of Pennsylvania and all Acceptance testing has been completed to the satisfaction of Customer.

    1.1.2 Year 2:  1/1/2020 – 12/31/2020: **$31,931.00** invoice will be issued on 1/1/2020

    1.1.3 Year 3:  1/1/2021 – 12/31/2021: **$31,931.00** invoice will be issued on 1/1/2021

    1.1.4 Year 4:  1/1/2022 – 12/31/2022: **$31,931.00** invoice will be issued on 1/1/2022

    1.1.5 Year 5:  1/1/2023 – 12/31/2023: **$31,931.00** invoice will be issued on 1/1/2023

    1.1.6 Year 6:  1/1/2024 – 12/31/2024: **$31,931.00** invoice will be issued on 1/1/2024

    1.1.7 Year 7:  1/1/2025 – 12/31/2025: **$31,931.00** invoice will be issued on 1/1/2025

    1.1.8 Year 8:  1/1/2026 – 12/31/2026: **$31,931.00** invoice will be issued on 1/1/2026

2. <u>System Description</u> - Prices of equipment, technical facilities, software, and other related services for voting, vote counting, and result processing.

| DESCRIPTION | QTY |
|---|---|
| **Central Scanning Solution: Absentee / Central Count** | |
| ImageCast Central Kit: Canon M160II Document scanner includes:   ImageCast Central Software, Dell Optiplex 7440 All-in-One, iButton programmer and key, cables | 2 |
| **In-Person Voting Solution: Polling Location Hardware** | |
| ImageCast X BMD (21 inch) Kit includes:  ICX Firmware, Tablet, 5 voter activation cards, printer, cables, power cord | 15 |
| Universal Power Supply (UPS) for ICX BMD | 15 |
| Audio Tactile Interface (ATI) Accessible Unit | 15 |
| ImageCast X Voting Booth - Standard | 12 |
| ICX Prime BMD Bag Kit | 15 |

FULTON COUNTY V. DOMINION, EXHIBIT A-12

| Election Management Hardware | |
|---|---|
| Democracy Suite EMS Express Server Configuration Kit - Up to 7 clients | 1 |
| EMS Client Workstation Configuration Kit | 1 |
| Adjudication Workstation Kit | 1 |
| **Software Licenses** | |
| Democracy Suite (EMS) Application | 1 |
| ICC Adjudication Application | 1 |
| Automated Test Decks Application | 1 |
| **Support and Implementation Services** | **#** |
| Project Management | 5 |
| Training | 5 |
| On-Site Election Support (3 days for each Election) | 2 |

3. <u>Detailed Descriptions</u>

   3.1 ***ImageCast Central Scanner (ICC)***.  The ImageCast Central Scanner is commercial off-the-shelf digital scanners configured to work with the ImageCast Central Software for high speed ballot tabulation. Each ImageCast Central Scanner includes the following components:

      3.1.1 Canon M160II document scanner

      3.1.2 ImageCast Central Software

      3.1.3 OptiPlex 7440 All-in-One Series with pre-loaded software

      3.1.4 iButton Security Key

      3.1.5 iButton Programmer and iButton Key Switch & Cat5 RJ 45 Cables used with Democracy Suite to transfer security and election information to the iButtons for use with the ICC.

   3.2 ***ImageCast® X ("ICX").***

      3.2.1 <u>Application:</u>  ImageCast X BMD is a touchscreen in-person voting device and ballot marking device. Voting sessions are initiated on the tablet by either a smart card or the entry of a numeric code based on activation. The ballot is loaded directly onto the standalone device. All voting activity is performed at the tablet, including accessible voting. Accessible voting interfaces connect to the tablet via an Audio Tactile Interface or ATI. After the voter reviews the ballot selections, a paper ballot is created for the voter from a printer in the voting booth. The printed ballot contains a written summary of the voter's choices, as well as a 2D barcode which is read by Dominion's ImageCast Precinct tabulator. No votes are stored on the ImageCast X-BMD unit. All votes can be tabulated and stored both the ImageCast Precinct Tabulators.

      3.2.2 <u>Components:</u> ImageCast X BMD is composed of a 21" Avalue touchscreen, Android OS 4.4.4, DC 19V input, HP LaserJet Pro M402dne laser printer, 6' cable. 5 smart cards, and 8GB flash drive.

FULTON COUNTY V. DOMINION, EXHIBIT A-13

3.3 **Audio Tactile Device ("ATI").** The ATI connects to the ICX via the port located on the right side of the unit. A set of headphones connects directly to the ATI controller. Following the audio voting process using the ATI controller, the ICX-BMD printer produces a marked paper ballot which serves as the official ballot record.

3.4 **ImageCast Software.** The Parties will enter into software licenses for the ImageCast software, substantially in the form of Exhibit B to this Agreement. The Dominion software includes, without limitation:

3.4.1 AuditMark[1]. For each ballot that is scanned and accepted into the unit, a corresponding ballot image is created and stored for audit purposes. The image consists of two parts described below.

- The top portion of the image contains a scanned image of the ballot.
- The bottom portion consists of a machine-generated type-out showing each mark that the unit interpreted for that particular ballot. This is referred to as an AuditMark.

3.5 **Democracy Suite Software** is suite of election management software that supports all ImageCast voting channels from a single comprehensive database. The Democracy Suite EMS consists of the following components:

3.5.1 Election Event Designer (EED). The EED Client Application is the primary application used for the definition and management of election event. EED is responsible for the definition of election projects. Each election project is represented as an instance of the election domain database with associated set of election project file based artifacts. The definition of the election project can be initiated by importing the election data through the Election Data Translator (EDT) module from external systems or by defining election project entities without importing external data. It is important to note that an election project initiated through EDT can be further modified within the EED Client Application. The system can generate two types of paper ballots:

- Proofing ballots – ballots produced to allow election officials the ability to proof ballot content and styling. These ballots cannot be processed by the ImageCast as they don't have proper ballot barcodes. These ballots are overprinted with the text "Proofing Ballots – date/time"
- Official ballots – represent production ready, press ready ballots in PDF format with barcodes and without any overprinting.

3.5.2 Results Tally and Reporting (RTR). The RTR Client Application is the application used for the tally, reporting and publishing of election results.

3.5.3 ImageCast Adjudication Application. The Adjudication application is a client and server application used to review and adjudicate ImageCast Central Scanner ballot images. The application uses tabulator results files and scanned images to allow election administrators to make adjudications to ballots with auditing and reporting capabilities. The Adjudication Application examines such voter exceptions as overvotes, undervotes, blank contests,

---

[1] AuditMark is a registered trademark of Dominion Voting Systems Inc.

FULTON COUNTY V. DOMINION, EXHIBIT A-14

blank ballots, write-in selections, and marginal marks. The application works in two basic modes: election project setup and adjudication. The Adjudication Application can be used in a multi-client environment. Adjudication Application eliminates the need to physically rescan ballots, which can potentially damage the originals and cause chain-of-custody concerns

3.5.4   Audio Studio. The system uses Cepstral, a third-party text-to-audio synthesizer, to automatically generate audio ballots for the ImageCast X Ballot Marking Device. The County also has the option to import human-recorded audio, with or without the use of Audio Studio. Pronunciation may be modified using the Cepstral's Swifttalker application. The system outputs audio ballots (PNG images, SPX audio files and XML definition files), definition reports (XML, Excel or HTML files), and election definition files required to program the ImageCast X.

3.5.5   Automated Test Deck (ATD). ATD is an application used to create test decks for running Pre-Logic and Accuracy Test with marking pattern requirements. The application can be used to access the election database and produce a set of print-ready PDFs and results tables for testing.

3.6   **Support and Implementation Services.**

3.7.1   Project Management Support. Dominion will provide Project management support to oversee the general operations of the Project through the Agreement Term. The Project manager is responsible for arranging all meetings, visits and consultations between the parties and for all administrative matters such as invoices, payments and amendments. The Parties shall develop and finalize a Project implementation plan including a training and delivery schedule. The Parties agree that during the course of the implementation, changes to the Project schedule may be required. Any changes to the Project schedule must be mutually agreed to by both Parties and such agreement shall not be unreasonably withheld.

3.7.2   System Acceptance Testing Support. Dominion will provide direct onsite training and support during the System Acceptance Testing period.

3.7.3   ImageCast X – This training introduces the ImageCast X system with an emphasis on the operation of the hardware. Students can expect to learn general operations, logic and accuracy testing, Election Day setup and operation, and troubleshooting.

3.7.4   ImageCast® ICC – This training introduces the ImageCast ICC with an emphasis on the operation of the hardware. Students can expect to learn general operations, logic and accuracy testing, ballot scanning operation, and troubleshooting. In addition, training will include resolution via the adjudication application.

3.7.5   EMS Server Installation, Configuration & Testing. Dominion will provide a minimum total of one (1) day of direct onsite support for EMS Server installation, configuration & testing.

FULTON COUNTY V. DOMINION, EXHIBIT A-15

3.7.6   <u>Democracy Suite EMS System</u> – Training covers defining an election project in Democracy Suite EED. Topics include importing jurisdictional information, ballot layout, proofing and printing, election file creation (ICX, and ICC), automated test deck creation, loading elections, tallying results (including adjudication tally), and generating reports.

3.7.7   <u>On-Site Election Day Support.</u> Dominion will provide three (3) days (inclusive of travel) of direct onsite election support for two (2) elections.

3.8   ***Travel and Expenses included.***  All costs of Dominion transportation, lodging and meal expenses are included during the Agreement Term.

3.9   ***Ongoing telephone support***. Telephone support shall be available for Customers during the Term of the Agreement at no additional costs.

3.10  ***Other Services, Consumables or Equipment.***  Any other services, consumables or equipment not specifically identified in this Agreement are available for purchase by the Customer at the then current Dominion list price.

FULTON COUNTY V. DOMINION, EXHIBIT A-16

# EXHIBIT B

## SOFTWARE LICENSE TERMS AND CONDITIONS

This Exhibit B is part of the Agreement between Dominion and Customer to which it is attached.

**1.     Definitions.** Capitalized terms used herein have the meaning given in the Agreement unless otherwise defined herein.

1.1.    "Agreement" means the agreement between the Parties for the use of the licensed Software to which this Exhibit B is attached and incorporated into.

1.2.    "Licensee" means Customer, as the term is defined in the Agreement.

1.3.    "Licensor" means Dominion Voting Systems, Inc.

1.4.    "Software" means Dominion Software, as the term is defined in the Agreement.

1.5.    "Specifications" means descriptions and data regarding the features, functions and performance of the Software, as set forth in user manuals or other applicable documentation provided by Licensor.

1.6.    "Third-Party Products" means any software or hardware obtained from third-party manufacturers or distributers and provided by Licensor hereunder.

**2.     License Terms.**

2.1.    License Limitations.    Licensee's use of the Software pursuant to the License granted in the Agreement is subject to the terms herein. Licensee may only use the Software for its own internal business purposes and conducting elections and solely in conjunction with the EMS Hardware.  The License shall only be effective during the Term and cannot be transferred or sublicensed.

2.2.    Print Copyright License.    Subject to the Print Copyright License terms and conditions as defined in Schedule A attached hereto, Licensor grants to Licensee a non-exclusive, non-transferable print copyright license as defined in Schedule A.

2.3.    Third-Party Products.  When applicable, Licensor hereby sublicenses any software that constitutes or is contained in Third-Party Products, in object code form only, to Licensee for use during the Term.

2.4.    No Other Licenses. Other than as expressly set forth herein, (a) Licensor grants no licenses, expressly or by implication, and (b) Licensor's entering into the Agreement will not be deemed to license or assign any intellectual property rights of Licensor to Licensee or any third party. Licensee agrees not to use the Software as a service bureau for elections outside the Licensee's jurisdiction and agrees not to reverse engineer or otherwise attempt to derive the source code of the Software. The Licensee shall have no power to transfer or grant sub-licenses for the Software.  Any use of all or any portion of the Software not expressly permitted is strictly prohibited.

2.5.    Intellectual Property Infringement Indemnification.  If a third party claims that the Software or System infringes any United States patent, copyright, trade secret or similar

FULTON COUNTY V. DOMINION, EXHIBIT A-17

intellectual property right, Dominion shall defend Licensee against such claim at Dominion's expense and pay all damages that a court finally awards against Licensee. If such a claim is made or appears possible, Dominion shall, within sixty (60) days of such claim, and at its option: (a) secure for Licensee the right to continue to use the infringing portion of the Software or System; or (b) modify or replace the Software and System so that it is non-infringing but retains equivalent functionality.  If neither of the foregoing options is reasonably available, Dominion shall require Licensee to return the Software or System, and Dominion shall refund Licensee amounts calculated pursuant to the Software License fee, on a pro-rate basis. The foregoing notwithstanding, Dominion shall have no obligation to indemnify Licensee for any infringement claim based on Licensee's modification or misuse of the Software, if the claim would have been avoided had the Software not been modified or misused.

**3.      Payment**.  In consideration of the grant of the license, the Licensee shall pay the license fees set forth in the Agreement and Exhibit A of the Agreement.

**4.      Upgrades and Certification**.  During the Term, Licensor may provide upgrades to Licensee under the following terms and conditions.

4.1.      Upgrades.   In the event that Licensor, at its sole discretion, certifies a Software upgrade under the applicable laws and regulations of the Customer's State, Licensor shall make the certified Software upgrade available to the Licensee at no additional cost.

4.2.      Certification Requirement.   Notwithstanding any other terms of this Agreement, Licensor shall not provide, and shall not be obligated to provide under this Agreement any upgrade, enhancement or other software update that has not been certified under the applicable provisions of the election laws and regulations of the Customer's State.

**5.      Prohibited Acts**.   The Licensee shall not, without the prior written permission of Licensor:

5.1.      Transfer or copy onto any other storage device or hardware or otherwise copy the Software in whole or in part except for purposes of system backup;

5.2.      Reverse engineer, disassemble, decompile, decipher or analyze the Software in whole or in part;

5.3.      Alter or modify the Software in any way or prepare any derivative works of the Software or any part of parts of the Software;

5.4.      Alter, remove or obstruct any copyright or proprietary notices from the Software, or fail to reproduce the same on any lawful copies of the Software.

**6.      Return of Software.** Upon termination or expiration of this Agreement, Licensee shall forthwith return to Licensor all Software in its possession or control, or destroy all such Software from any electronic media, and certify in writing to Licensor that it has been destroyed.

FULTON COUNTY V. DOMINION, EXHIBIT A-18

**7.** **Warranties**. The following warranties will apply to all Software during the Term.

7.1. <u>Software Warranty Terms.</u> Licensor warrants that the Software will function substantially in accordance with the Specifications during the Term. The Licensor also warrants that the Software will comply with the voting system certification requirements and laws of the Customer's State (collectively the "Requirements") in effect as of the date the Software is certified by the certification authority of the Customer's State. This provision applies to the initially installed Software as well as any subsequent upgrades pursuant to Section 4 herein. However, the Licensor will not be required to make modifications to the Software or System as a result of changes in the Requirements. The foregoing warranty will be void in the event of the Software (i) having been modified by any party other than Licensor or (ii) having been used by the Licensee for purposes other than those for which the Software was designed by Licensor. If Licensor establishes that a failure of the foregoing warranty that is reported by Licensee is not covered by the foregoing warranty, the Licensee shall be responsible for the costs of Licensor's investigative and remedial work at Licensor's then current rates.

7.2. <u>Corrections.</u> If the Licensee believes that the Software is not functioning substantially in accordance with the Specifications or Requirements, the Licensee shall provide Licensor with written notice of the material failure within thirty (30) days of discovering the material failure, provided that the Licensee can reproduce the material failure to Licensor. The Licensor shall correct the deficiencies, at no additional cost to the Licensee and incorporate such corrections into the next version certified by the Customer's State.

7.3 <u>Third-Party Products.</u> The warranties herein do not apply to any Third-Party Products. However, to the extent permitted by the manufacturers of Third-Party Products, Licensor shall pass through to Licensee all warranties such manufacturers make to Licensor regarding the operation of such Third-Party Products.

7.4. <u>NO OTHER WARRANTIES.</u> EXCEPT AS SET FORTH IN THE AGREEMENT AND HEREIN, LICENSOR DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESS, OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY BASED ON A COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

## SCHEDULE A

## PRINT COPYRIGHT LICENSE TERMS AND CONDITIONS

1.  **Definitions.** For the purposes of this Agreement, the following are defined terms:

    1.1.  "Derivative Works" means any work that is based upon or derived from the Licensor's voting systems' ballots, including without limitation, sample ballots and voting booklets.

    1.2.  "Voting Systems' Ballots" means any ballot created for use with any voting system owned or licensed by the Licensor.

2.  **Print Copyright License and Use.**

    2.1.  <u>Copyright License Grant.</u> Licensor grants to the Licensee a non-exclusive, non-transferable copyright license to print, reproduce, distribute or otherwise copy the Licensor's Voting Systems' Ballots and any Derivative Works (collectively the "Materials") pursuant to the terms and conditions of this Schedule A.

    2.2.  <u>Copyright License Use.</u> Other than as expressly set forth herein, (a) Licensor grants no other licenses, expressly or by implication, and (b) Licensor's entering into and performing the Agreement will not be deemed to license or assign any intellectual property rights of Licensor to Licensee or any third party, (c) the copyright license granted herein cannot be transferred or sublicensed and the Voting Systems' Ballots or Derivative Works cannot be reproduced by any third party without the prior written consent of the Licensor, including without limitation:

        (i)   any commercial or non-commercial printer
        (ii)  any third party vendor using ballot on demand system.

    2.3.  <u>Rights and Interests.</u>  All right, title and interest in the Material, including without limitation, any copyright, shall remain with the Licensor.

3.  **No Copyright Warranties.**  EXCEPT AS SET FORTH HEREIN, LICENSOR DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESS, OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY BASED ON A COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

**AMENDMENT 1**
**TO THE VOTING SYSTEM AND MANAGED SERVICES AGREEMENT**
**BY AND BETWEEN**
**DOMINION VOTING SYSTEMS, INC.**
**AND FULTON COUNTY, PA**

This Amendment 1 to the Voting Systems and Managed Services Agreement, is made and entered into as of this 15th day of September 2019 between Fulton County, PA ("Customer") and Dominion Voting Systems, Inc. ("Dominion").

**RECITALS**

**WHEREAS**, on April 1, 2019, the Customer and Dominion entered into a Voting Systems and Managed Services Agreement (the "Agreement"); and

**WHEREAS**, the Customer and Dominion now desire to amend the Agreement as described herein:

**TERMS**

**NOW, THEREFORE**, the parties amend the Agreement in accordance with the terms and conditions set forth below:

A.      **Incorporation of Recitals.** The above recitals are true and correct and incorporated herein by this reference as if fully set forth.

B.      **Exhibit A.**   The Customer and Dominion agree to delete original Exhibit A of the Agreement in its entirety and replace it with the new Exhibit A attached hereto.

C.      **All Other Terms.**  All other terms and provisions of the Agreement shall remain in full force and effect

FULTON COUNTY V. DOMINION, EXHIBIT A-21

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the date first above written.

**DOMINION VOTING SYSTEMS, INC.**

_____
Authorized Signature

John Poulos
Name

President & CEO
Title

9/15/2019
Date

**FULTON COUNTY, PA**

_____
Authorized Signature

_____
Name

_____
Title

Sept 17, 2019
Date

FULTON COUNTY V. DOMINION, EXHIBIT A-22

**EXHIBIT A**
**VOTING SYSTEM AGREEMENT**
**BY AND BETWEEN DOMINION VOTING SYSTEMS**
**AND FULTON COUNTY, PA**

**PRICING SUMMARY AND DELIVERABLES DESCRIPTION**

1. <u>Pricing/Payment Summary and Descriptions</u>

   1.1 **Pricing and Payment Summary**. The total annual managed service contract pricing shall equal **$33,028.00**/year for a total of eight (8) years. The following is the invoicing schedule for the annual Customer payments. The Customer shall pay invoices in a timely manner and no later than thirty (30) calendar days from receipt of a Dominion invoice. All payments shall be made is in U.S. Dollars. Pricing does not include shipping or any applicable taxes.

   1.1.1 Year 1 shall cover the time period from the Agreement Effective Date through December 31, 2019. The Year 1 invoice of **$33,028.00** will be issued immediately after System certification by the State of Pennsylvania. Under no circumstance will payment be made by the Customer until the System is certified for use by the State of Pennsylvania and all Acceptance testing has been completed to the satisfaction of Customer.

   1.1.2 Year 2: 1/1/2020 – 12/31/2020: **$33,028.00** invoice will be issued on 1/1/2020

   1.1.3 Year 3: 1/1/2021 – 12/31/2021: **$33,028.00** invoice will be issued on 1/1/2021

   1.1.4 Year 4: 1/1/2022 – 12/31/2022: **$33,028.00** invoice will be issued on 1/1/2022

   1.1.5 Year 5: 1/1/2023 – 12/31/2023: **$33,028.00** invoice will be issued on 1/1/2023

   1.1.6 Year 6: 1/1/2024 – 12/31/2024: **$33,028.00** invoice will be issued on 1/1/2024

   1.1.7 Year 7: 1/1/2025 – 12/31/2025: **$33,028.00** invoice will be issued on 1/1/2025

   1.1.8 Year 8: 1/1/2026 – 12/31/2026: **$33,028.00** invoice will be issued on 1/1/2026

2. <u>System Description</u> - Prices of equipment, technical facilities, software, and other related services for voting, vote counting, and result processing.

| DESCRIPTION | QTY |
|---|---|
| **Central Scanning Solution: Absentee / Central Count** | |
| ImageCast Central Kit: Canon M160II Document scanner includes:   ImageCast Central Software, Dell Optiplex 7440 All-in-One, iButton programmer and key, cables | 2 |
| **In-Person Voting Solution: Polling Location Hardware** | |
| ImageCast X BMD (21 inch) Kit includes:  ICX Firmware, Tablet, 5 voter activation cards, printer, cables, power cord | 15 |
| Mobile Ballot Printing Kit – Laser Printer, Laptop, cables | 1 |
| Universal Power Supply (UPS) for ICX BMD | 15 |
| Audio Tactile Interface (ATI) Accessible Unit | 15 |
| ImageCast X Voting Booth - Standard | 12 |
| ICX Prime BMD Bag Kit | 15 |

FULTON COUNTY V. DOMINION, EXHIBIT A-23

| Election Management Hardware | |
|---|---|
| Democracy Suite EMS Express Server Configuration Kit - Up to 7 clients | 1 |
| EMS Client Workstation Configuration Kit | 1 |
| Adjudication Workstation Kit | 1 |
| **Software Licenses** | |
| Democracy Suite (EMS) Application | 1 |
| ICC Adjudication Application | 1 |
| Automated Test Decks Application | 1 |
| Mobile Ballot Printing Application | 1 |
| **Support and Implementation Services** | # |
| Project Management | 5 |
| Training | 5 |
| On-Site Election Support (3 days for each Election) | 2 |

3. Detailed Descriptions

   3.1 *ImageCast Central Scanner (ICC)*. The ImageCast Central Scanner is commercial off-the-shelf digital scanners configured to work with the ImageCast Central Software for high speed ballot tabulation. Each ImageCast Central Scanner includes the following components:

   3.1.1 Canon M160II document scanner

   3.1.2 ImageCast Central Software

   3.1.3 OptiPlex 7440 All-in-One Series with pre-loaded software

   3.1.4 iButton Security Key

   3.1.5 iButton Programmer and iButton Key Switch & Cat5 RJ 45 Cables used with Democracy Suite to transfer security and election information to the iButtons for use with the ICC.

   3.2 *ImageCast® X ("ICX").*

   3.2.1 Application: ImageCast X BMD is a touchscreen in-person voting device and ballot marking device. Voting sessions are initiated on the tablet by either a smart card or the entry of a numeric code based on activation. The ballot is loaded directly onto the standalone device. All voting activity is performed at the tablet, including accessible voting. Accessible voting interfaces connect to the tablet via an Audio Tactile Interface or ATI. After the voter reviews the ballot selections, a paper ballot is created for the voter from a printer in the voting booth. The printed ballot contains a written summary of the voter's choices, as well as a 2D barcode which is read by Dominion's ImageCast Precinct tabulator. No votes are stored on the ImageCast X-BMD unit. All votes can be tabulated and stored both the ImageCast Precinct Tabulators.

   3.2.2 Components: ImageCast X BMD is composed of a 21" Avalue touchscreen, Android OS 4.4.4, DC 19V input, HP LaserJet Pro M402dne laser printer, 6' cable. 5 smart cards, and 8GB flash drive.

FULTON COUNTY V. DOMINION, EXHIBIT A-24

3.3 **Audio Tactile Device ("ATI").** The ATI connects to the ICX via the port located on the right side of the unit. A set of headphones connects directly to the ATI controller. Following the audio voting process using the ATI controller, the ICX-BMD printer produces a marked paper ballot which serves as the official ballot record.

3.4 **ImageCast Software.** The Parties will enter into software licenses for the ImageCast software, substantially in the form of Exhibit B to this Agreement. The Dominion software includes, without limitation:

    3.4.1 <u>AuditMark[1].</u> For each ballot that is scanned and accepted into the unit, a corresponding ballot image is created and stored for audit purposes. The image consists of two parts described below.

- The top portion of the image contains a scanned image of the ballot.
- The bottom portion consists of a machine-generated type-out showing each mark that the unit interpreted for that particular ballot. This is referred to as an AuditMark.

3.5 **Democracy Suite Software** is suite of election management software that supports all ImageCast voting channels from a single comprehensive database. The Democracy Suite EMS consists of the following components:

    3.5.1 <u>Election Event Designer (EED).</u> The EED Client Application is the primary application used for the definition and management of election event. EED is responsible for the definition of election projects. Each election project is represented as an instance of the election domain database with associated set of election project file based artifacts. The definition of the election project can be initiated by importing the election data through the Election Data Translator (EDT) module from external systems or by defining election project entities without importing external data. It is important to note that an election project initiated through EDT can be further modified within the EED Client Application. The system can generate two types of paper ballots:

- Proofing ballots – ballots produced to allow election officials the ability to proof ballot content and styling. These ballots cannot be processed by the ImageCast as they don't have proper ballot barcodes. These ballots are overprinted with the text "Proofing Ballots – date/time"
- Official ballots – represent production ready, press ready ballots in PDF format with barcodes and without any overprinting.

    3.5.2 <u>Results Tally and Reporting (RTR).</u> The RTR Client Application is the application used for the tally, reporting and publishing of election results.

    3.5.3 <u>ImageCast Adjudication Application.</u> The Adjudication application is a client and server application used to review and adjudicate ImageCast Central Scanner ballot images. The application uses tabulator results files and scanned images to allow election administrators to make adjudications to ballots with auditing and reporting capabilities. The Adjudication Application examines such voter exceptions as overvotes, undervotes, blank contests,

---

[1] AuditMark is a registered trademark of Dominion Voting Systems Inc.

FULTON COUNTY V. DOMINION, EXHIBIT A-25

blank ballots, write-in selections, and marginal marks. The application works in two basic modes: election project setup and adjudication. The Adjudication Application can be used in a multi-client environment. Adjudication Application eliminates the need to physically rescan ballots, which can potentially damage the originals and cause chain-of-custody concerns.

3.5.4   <u>Audio Studio.</u>   The system uses Cepstral, a third-party text-to-audio synthesizer, to automatically generate audio ballots for the ImageCast X Ballot Marking Device. The County also has the option to import human-recorded audio, with or without the use of Audio Studio.  Pronunciation may be modified using the Cepstral's Swifttalker application. The system outputs audio ballots (PNG images, SPX audio files and XML definition files), definition reports (XML, Excel or HTML files), and election definition files required to program the ImageCast X.

3.5.5   <u>Automated Test Deck (ATD).</u>   ATD is an application used to create test decks for running Pre-Logic and Accuracy Test with marking pattern requirements. The application can be used to access the election database and produce a set of print-ready PDFs and results tables for testing.

3.6   ***Support and Implementation Services.***

3.7.1   <u>Project Management Support.</u>  Dominion will provide Project management support to oversee the general operations of the Project through the Agreement Term.  The Project manager is responsible for arranging all meetings, visits and consultations between the parties and   for         all administrative matters such as invoices, payments and amendments.  The Parties shall develop and finalize a Project implementation plan including a training and delivery schedule.  The Parties agree that during the course of the implementation, changes to the Project schedule may be required.  Any changes to the Project schedule must be mutually agreed to by both Parties and such agreement shall not be unreasonably withheld.

3.7.2   <u>System Acceptance Testing Support.</u>  Dominion will provide direct onsite training and support during the System Acceptance Testing period.

3.7.3   <u>ImageCast X</u> – This training introduces the ImageCast X system with an emphasis on the operation of the hardware. Students can expect to learn general operations, logic and accuracy testing, Election Day setup and operation, and troubleshooting.

3.7.4   <u>ImageCast® ICC</u> – This training introduces the ImageCast ICC with an emphasis on the operation of the hardware. Students can expect to learn general operations, logic and accuracy testing, ballot scanning operation, and troubleshooting. In addition, training will include resolution via the adjudication application.

3.7.5   <u>EMS Server Installation, Configuration & Testing.</u>  Dominion will provide a minimum total of one (1) day of direct onsite support for EMS Server installation, configuration & testing.

FULTON COUNTY V. DOMINION, EXHIBIT A-26

    3.7.6   <u>Democracy Suite EMS System</u> – Training covers defining an election project in Democracy Suite EED. Topics include importing jurisdictional information, ballot layout, proofing and printing, election file creation (ICX, and ICC), automated test deck creation, loading elections, tallying results (including adjudication tally), and generating reports.

    3.7.7   <u>On-Site Election Day Support.</u> Dominion will provide three (3) days (inclusive of travel) of direct onsite election support for two (2) elections.

**3.8**   ***Mobile Ballot Printing*** is an application used to search, preview and print ballots via a local printer device. The application makes use of ballot information and PDFs produced by the Election Event Designer application and information provided through the customer voter registration system.

**3.9**   ***Travel and Expenses included.*** All costs of Dominion transportation, lodging and meal expenses are included during the Agreement Term.

**3.10**   ***Ongoing telephone support***. Telephone support shall be available for Customers during the Term of the Agreement at no additional costs.

**3.11**   ***Other Services, Consumables or Equipment.*** Any other services, consumables or equipment not specifically identified in this Agreement are available for purchase by the Customer at the then current Dominion list price.

FULTON COUNTY V. DOMINION, EXHIBIT A-27

**AMENDMENT 2**
TO THE VOTING SYSTEM AND MANAGED SERVICES AGREEMENT
BY AND BETWEEN
DOMINION VOTING SYSTEMS, INC.
AND FULTON COUNTY, PA

This Amendment 2 to the Voting Systems and Managed Services Agreement, is made and entered into as of this 15th day of February 2020 between Fulton County, PA ("Customer") and Dominion Voting Systems, Inc. ("Dominion").

## RECITALS

**WHEREAS**, on April 1, 2019, the Customer and Dominion entered into a Voting Systems and Managed Services Agreement (the "Agreement"); and

**WHEREAS**, on September 15, 2019, the Customer and Dominion entered into Amendment 1 to the Voting Systems and Managed Services Agreement; and

**WHEREAS**, the Customer and Dominion now desire to amend the Agreement as described herein:

## TERMS

**NOW, THEREFORE**, the parties amend the Agreement in accordance with the terms and conditions set forth below:

A.      **Incorporation of Recitals**. The above recitals are true and correct and incorporated herein by this reference as if fully set forth.

B.      **Exhibit A.**   The Customer and Dominion agree to delete the original Exhibit A of the Agreement and the amended Exhibit A from Amendment 1 to the Agreement in their entirety and replace it with the new Exhibit A attached hereto to this Amendment 2.

C.      **All Other Terms.**   All other terms and provisions of the Agreement shall remain in full force and effect

FULTON COUNTY V. DOMINION, EXHIBIT A-28

**IN WITNESS WHEREOF,** the parties have caused this Amendment 2 to be executed as of the date first above written.

DOMINION VOTING SYSTEMS, INC.                    FULTON COUNTY, PA

_____                  _____
Authorized Signature                             Authorized Signature

John Poulos                                      Stuart Ulsh
_____                  _____
Name                                             Name

President & CEO                                  Commissioner
_____                  _____
Title                                            Title

2/15/2020                                        2/11/20
_____                  _____
Date                                             Date

FULTON COUNTY V. DOMINION, EXHIBIT A-29

**EXHIBIT A**
VOTING SYSTEM AGREEMENT
BY AND BETWEEN DOMINION VOTING SYSTEMS
AND FULTON COUNTY, PA

**PRICING SUMMARY AND DELIVERABLES DESCRIPTION**

1. Pricing/Payment Summary and Descriptions

   1.1 **Pricing and Payment Summary**. The total amount of the managed service contract pricing shall equal **$320,483.00** for a total of eight (8) years. The following is the invoicing schedule for the annual Customer payments.  The Customer shall pay invoices in a timely manner and no later than thirty (30) calendar days from receipt of a Dominion invoice. All payments shall be made is in U.S. Dollars.  Pricing does not include shipping or any applicable taxes.

      1.1.1 Year 1 shall cover the time period from the Agreement Effective Date through December 31, 2019. The Year 1 invoice of **$33,028.00** will be issued immediately after System certification by the State of Pennsylvania.  Under no circumstance will payment be made by the Customer until the System is certified for use by the State of Pennsylvania and all Acceptance testing has been completed to the satisfaction of Customer.

      1.1.2 Year 2: 1/1/2020 – 12/31/2020: **$41,065.00** invoice will be issued on 1/1/2020

      1.1.3 Year 3: 1/1/2021 – 12/31/2021: **$41,065.00** invoice will be issued on 1/1/2021

      1.1.4 Year 4: 1/1/2022 – 12/31/2022: **$41,065.00** invoice will be issued on 1/1/2022

      1.1.5 Year 5: 1/1/2023 – 12/31/2023: **$41,065.00** invoice will be issued on 1/1/2023

      1.1.6 Year 6: 1/1/2024 – 12/31/2024: **$41,065.00** invoice will be issued on 1/1/2024

      1.1.7 Year 7: 1/1/2025 – 12/31/2025: **$41,065.00** invoice will be issued on 1/1/2025

      1.1.8 Year 8: 1/1/2026 – 12/31/2026: **$41,065.00** invoice will be issued on 1/1/2026

2. System Description - Prices of equipment, technical facilities, software, and other related services for voting, vote counting, and result processing.

| DESCRIPTION | QTY |
|---|---|
| **Central Scanning Solution: Absentee / Central Count** | |
| ImageCast Central Kit: Canon G1130:   Includes Canon Model DR-G1130, Computer w/ 23" Monitor, Keyboard & Mouse, One 8GB USB Flash Drive & One I-Button, patch cable | 2 |
| **In-Person Voting Solution: Polling Location Hardware** | |
| ImageCast X BMD (21 inch) Kit includes:  ICX Firmware, Tablet, 5 voter activation cards, printer, cables, power cord | 15 |
| Mobile Ballot Printing Kit – Laser Printer, Laptop, cables | 1 |
| Universal Power Supply (UPS) for ICX BMD | 15 |
| Audio Tactile Interface (ATI) Accessible Unit | 15 |
| ImageCast X Voting Booth - Standard | 12 |
| ICX Prime BMD Bag Kit | 15 |

FULTON COUNTY V. DOMINION, EXHIBIT A-30

| Election Management Hardware | |
|---|---|
| Democracy Suite EMS Express Server Configuration Kit - Up to 7 clients | 1 |
| EMS Client Workstation Configuration Kit | 1 |
| Adjudication Workstation Kit | 1 |
| **Software Licenses** | |
| Democracy Suite (EMS) Application | 1 |
| ICC Adjudication Application | 1 |
| Automated Test Decks Application | 1 |
| Mobile Ballot Printing Application | 1 |
| **Support and Implementation Services** | **#** |
| Project Management | 5 |
| Training | 5 |
| On-Site Election Support (3 days for each Election) | 2 |

3. Detailed Descriptions

    3.1   ***ImageCast Central Scanner (ICC)***. Each ImageCast Central Scanner includes the following components:

        3.1.1   Canon DR-G1130 high speed document scanner

        3.1.2   ImageCast Central Software

        3.1.3   Workstation with pre-loaded software

        3.1.4   iButton Security Key

        3.1.5   iButton Programmer and iButton Key Switch & Cat5 RJ 45 Cables used with Democracy Suite to transfer security and election information to the iButtons for use with the ICC.

    3.2   ***ImageCast® X ("ICX")***.

        3.2.1   <u>Application:</u>  ImageCast X BMD is a touchscreen in-person voting device and ballot marking device. Voting sessions are initiated on the tablet by either a smart card or the entry of a numeric code based on activation. The ballot is loaded directly onto the standalone device.  All voting activity is performed at the tablet, including accessible voting. Accessible voting interfaces connect to the tablet via an Audio Tactile Interface or ATI.  After the voter reviews the ballot selections, a paper ballot is created for the voter from a printer in the voting booth.  The printed ballot contains a written summary of the voter's choices, as well as a 2D barcode which is read by Dominion's ImageCast Precinct tabulator. No votes are stored on the ImageCast X-BMD unit. All votes can be tabulated and stored both the ImageCast Precinct Tabulators.

        3.2.2   <u>Components:</u> ImageCast X BMD is composed of a 21" Avalue touchscreen, Android OS 4.4.4, DC 19V input, HP LaserJet Pro M402dne laser printer, 6' cable. 5 smart cards, and 8GB flash drive.

FULTON COUNTY V. DOMINION, EXHIBIT A-31

3.3 **Audio Tactile Device ("ATI").**  The ATI connects to the ICX via the port located on the right side of the unit. A set of headphones connects directly to the ATI controller. Following the audio voting process using the ATI controller, the ICX-BMD printer produces a marked paper ballot which serves as the official ballot record.

3.4 **ImageCast Software.**   The Parties will enter into software licenses for the ImageCast software, substantially in the form of Exhibit B to this Agreement.  The Dominion software includes, without limitation:

3.4.1 AuditMark[1]. For each ballot that is scanned and accepted into the unit, a corresponding ballot image is created and stored for audit purposes. The image consists of two parts described below.

- The top portion of the image contains a scanned image of the ballot.
- The bottom portion consists of a machine-generated type-out showing each mark that the unit interpreted for that particular ballot. This is referred to as an AuditMark.

3.5 **Democracy Suite Software** is suite of election management software that supports all ImageCast voting channels from a single comprehensive database. The Democracy Suite EMS consists of the following components:

3.5.1 Election Event Designer (EED). The EED Client Application is the primary application used for the definition and management of election event.  EED is responsible for the definition of election projects. Each election project is represented as an instance of the election domain database with associated set of election project file based artifacts. The definition of the election project can be initiated by importing the election data through the Election Data Translator (EDT) module from external systems or by defining election project entities without importing external data.   It is important to note that an election project initiated through EDT can be further modified within the EED Client Application.   The system can generate two types of paper ballots:

- Proofing ballots – ballots produced to allow election officials the ability to proof ballot content and styling. These ballots cannot be processed by the ImageCast as they don't have proper ballot barcodes. These ballots are overprinted with the text "Proofing Ballots – date/time"
- Official ballots – represent production ready, press ready ballots in PDF format with barcodes and without any overprinting.

3.5.2 Results Tally and Reporting (RTR). The RTR Client Application is the application used for the tally, reporting and publishing of election results.

3.5.3 ImageCast Adjudication Application. The Adjudication application is a client and server application used to review and adjudicate ImageCast Central Scanner ballot images. The application uses tabulator results files and scanned images to allow election administrators to make adjudications to ballots with auditing and reporting capabilities. The Adjudication Application examines such voter exceptions as overvotes, undervotes, blank contests,

---

[1] AuditMark is a registered trademark of Dominion Voting Systems Inc.

FULTON COUNTY V. DOMINION, EXHIBIT A-32

blank ballots, write-in selections, and marginal marks. The application works in two basic modes: election project setup and adjudication. The Adjudication Application can be used in a multi-client environment. Adjudication Application eliminates the need to physically rescan ballots, which can potentially damage the originals and cause chain-of-custody concerns.

3.5.4   <u>Audio Studio.</u>   The system uses Cepstral, a third-party text-to-audio synthesizer, to automatically generate audio ballots for the ImageCast X Ballot Marking Device. The County also has the option to import human-recorded audio, with or without the use of Audio Studio. Pronunciation may be modified using the Cepstral's Swifttalker application. The system outputs audio ballots (PNG images, SPX audio files and XML definition files), definition reports (XML, Excel or HTML files), and election definition files required to program the ImageCast X.

3.5.5   <u>Automated Test Deck (ATD).</u>   ATD is an application used to create test decks for running Pre-Logic and Accuracy Test with marking pattern requirements. The application can be used to access the election database and produce a set of print-ready PDFs and results tables for testing.

3.6   **Support and Implementation Services.**

3.7.1   <u>Project Management Support.</u>   Dominion will provide Project management support to oversee the general operations of the Project through the Agreement Term.   The Project manager is responsible for arranging all meetings, visits and consultations between the parties and   for            all administrative matters such as invoices, payments and amendments.   The Parties shall develop and finalize a Project implementation plan including a training and delivery schedule.   The Parties agree that during the course of the implementation, changes to the Project schedule may be required.   Any changes to the Project schedule must be mutually agreed to by both Parties and such agreement shall not be unreasonably withheld.

3.7.2   <u>System Acceptance Testing Support.</u>   Dominion will provide direct onsite training and support during the System Acceptance Testing period.

3.7.3   <u>ImageCast X</u> – This training introduces the ImageCast X system with an emphasis on the operation of the hardware. Students can expect to learn general operations, logic and accuracy testing, Election Day setup and operation, and troubleshooting.

3.7.4   <u>ImageCast® ICC</u> – This training introduces the ImageCast ICC with an emphasis on the operation of the hardware. Students can expect to learn general operations, logic and accuracy testing, ballot scanning operation, and troubleshooting. In addition, training will include resolution via the adjudication application.

3.7.5   <u>EMS Server Installation, Configuration & Testing.</u>   Dominion will provide a minimum total of one (1) day of direct onsite support for EMS Server installation, configuration & testing.

FULTON COUNTY V. DOMINION, EXHIBIT A-33

3.7.6   <u>Democracy Suite EMS System</u> – Training covers defining an election project in Democracy Suite EED. Topics include importing jurisdictional information, ballot layout, proofing and printing, election file creation (ICX, and ICC), automated test deck creation, loading elections, tallying results (including adjudication tally), and generating reports.

3.7.7   <u>On-Site Election Day Support.</u> Dominion will provide three (3) days (inclusive of travel) of direct onsite election support for two (2) elections.

3.8   ***Mobile Ballot Printing*** is an application used to search, preview and print ballots via a local printer device. The application makes use of ballot information and PDFs produced by the Election Event Designer application and information provided through the customer voter registration system.

3.9   ***Travel and Expenses included.*** All costs of Dominion transportation, lodging and meal expenses are included during the Agreement Term.

3.10   ***Ongoing telephone support.*** Telephone support shall be available for Customers during the Term of the Agreement at no additional costs.

3.11   ***Other Services, Consumables or Equipment.*** Any other services, consumables or equipment not specifically identified in this Agreement are available for purchase by the Customer at the then current Dominion list price.

FULTON COUNTY V. DOMINION, EXHIBIT A-34