# **APPENDIX**



Neutral
As of: November 20, 2023 7:25 PM Z

# *Garbutt v. Murray's Freightliner*

United States District Court for the Western District of Pennsylvania

August 10, 2021, Decided; August 10, 2021, Filed

Civil Action No. 21-cv-628

**Reporter**
2021 U.S. Dist. LEXIS 149582 *; 2021 WL 3513858

JOHN GARBUTT and MAX DRIVE LLC, Plaintiffs, v. MURRAY'S FREIGHTLINER, Defendant.

**Subsequent History:** Dismissed by, Without prejudice *Garbutt v. Freightliner, 2021 U.S. Dist. LEXIS 189061 (W.D. Pa., Sept. 28, 2021)*

## Core Terms

warranty, consumer product, repair, motion to dismiss, consumer, allegations, household purposes, particular purpose, express warranty, tractor-trailer, leased, buyer, private cause of action, factual allegations, practices, purposes, promise, unfair

**Counsel: [*1]** For JOHN GARBUTT, MAX DRIVER, LLC, Plaintiffs: Timothy J. Abeel, Jr., LEAD ATTORNEY, Timothy Abeel & Associates, P.C., Glen Mills, PA.

For MURRAY'S FREIGHTLINER, Defendant: Andrew D Shannon, LEAD ATTORNEY, Robb Leonard Mulvihill LLP, Pittsburgh, PA; LeeAnn A. Fulena, Robb Leonard Mulvihill LLP, BNY Mellon Center, Pittsburgh, PA.

**Judges:** MAUREEN P. KELLY, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** MAUREEN P. KELLY

## Opinion

**MEMORANDUM OPINION**

Re: ECF No. 6

Plaintiffs John Garbutt and Max Drive LLC[1] filed this action arising out of allegations that Defendant Murray's Freightliner violated the *Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq.*, and the *Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq.* ECF No. 1. Presently before the Court is Murray's Freightliner's Motion to Dismiss. ECF No. 6. For the reasons below, the Motion to Dismiss is granted.[2]

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs filed this action in the Court of Common Pleas of Allegheny County, Pennsylvania on March 23, 2021. ECF No. 1 ¶ 1. Defendant Murray's Freightliner removed this action to this Court on May 12, 2021 pursuant to *28 U.S.C. §§ 1331* and *1441*.

Plaintiffs John Garbutt ("Garbutt") and Max Drive LLC jointly bring this action; however, the Complaint is drafted as if brought on behalf of an individual **[*2]** plaintiff. ECF No. 1-2. Garbutt and Max Drive LLC claim they are a single "adult individual citizen" residing in Mississippi, and they refer to themselves as a singular "Plaintiff" throughout the Complaint. Id. ¶ 1. As a result, it is unclear to what extent Plaintiffs are referring to either Garbutt and/or Max Drive LLC in their allegations. Consistent with the Complaint, the Court refers to a singular plaintiff in summarizing the factual allegations.

---

[1] The parties refer to this entity as Max Driver LLC in their briefing relative to the instant Motion to Dismiss and in the Notice of Removal. ECF Nos. 1, 6 and 9. However, this entity is identified as Max Drive LLC in the Complaint and service records attached to the Complaint. ECF No. 1-2 at 1, 22-30. The Court uses the spelling in the Complaint.

[2] In accordance with the provisions of *28 U.S.C. § 636(c)(1)*, the parties voluntarily consented to having a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. ECF Nos. 12 and 13.

### A. Factual Allegations

According to the Complaint, "Plaintiff" purchased a 2016 Freightliner Cascadia (the "Vehicle") on or about August 7, 2015 in Pennsylvania for $175,212.09. Id. ¶¶ 3-5. Plaintiffs claim that Murray's Freightliner manufactured and warranted the Vehicle. Id. ¶ 3. In exchange for the purchase, Murray's Freightliner allegedly "issued to Plaintiff several warranties, guarantees, affirmations or undertakings with respect to the material or workmanship of the vehicle and/or remedial action in the event the vehicle fails to meet the promised specifications." Id. ¶ 6. Plaintiffs allege that the "parties' bargain" included "an extended warranty, as well as other guarantees, affirmations and undertakings as stated in Defendant's **[*3]** warranty materials and owner's manual." Id. ¶ 8.

An alleged copy of the purchase contract for the Vehicle is attached as Exhibit "A" to Plaintiffs' Complaint. Id. ¶ 5. However, Exhibit A is not a purchase contract dated August 7, 2015. Instead, it is a "lease purchase agreement" for a 2016 Freightliner Cascadia, dated July 15, 2019. Id. at 13-20. The agreement is between lessor Wasatch Leasing, LLC and lessee John Garbutt Jr., and it is stamped "[t]his chattel paper has been assigned to Mercedes-Benz Financial Service USA LLC or Daimler Trust . . . ." Id. Murray's Freightliner is not identified as a party to the agreement.

During the unspecified "warranty period," "Plaintiff" complained of defects or nonconformities in the Vehicle. Id. ¶ 10. On August 4, 2020, "Plaintiff" took the Vehicle to Murray's Freightliner in DuBois, Pennsylvania for service. Id. Technicians pulled the transmission to repair the clutch, which cost $7,100.00. Id.

On August 26, 2020, "Plaintiff" returned the Vehicle to Murray's Freightliner because parts that were fixed on August 4, 2020 began smoking and the Vehicle was experiencing issues going into gear.[3] Id. Technicians at Murray's Freightliner checked the Vehicle, **[*4]** but they did not identify any needed repairs. Id.

The next day, "Plaintiff" took the Vehicle to the next Freightliner dealership on his route, Fyda Freightliner of Youngstown, Pennsylvania, for a second opinion. Id. Technicians at this location identified and repaired leaks in the Vehicle that Murray's Freightliner had not been able to identify. Id.

On November 18, 2020, the Vehicle clutch "burst into pieces causing damage to the bell housing and transmission." Id. The Vehicle was towed to Velocity Freightliner in Flagstaff, Arizona, where it was repaired. Id.

Plaintiffs claim that technicians at Murray's Freightliner caused this damage by incorrectly installing the pilot bearing, and that they also improperly stripped the screws and used an adhesive to keep the screws in place. Id. After being notified of the damage to the Vehicle, Murray's Freightliner allegedly "falsely edited their technician's notes about the repair." Id. Plaintiffs claim they incurred damages of $71,285.00 as a result of the improperly installed parts. Id. In addition, they claim the Vehicle continues to "exhibit defects and nonconformities, which substantially impairs its use, value and/or safety." Id. ¶ 11.

### B. **[*5]** Legal Claims

Plaintiffs bring two claims. In Count I, Plaintiffs claim violations of the Magnuson-Moss Warranty Act ("MMWA"). In Count II, Plaintiffs claim violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

### C. Motion to Dismiss

Murray's Freightliner filed the instant Motion to Dismiss and Brief in Support on June 3, 2021. ECF Nos. 6 and 7. Plaintiffs filed a Response in opposition on June 28, 2021. ECF No. 9.[4] The Motion to Dismiss is ripe for consideration.

## II. LEGAL STANDARD

In assessing the sufficiency of a complaint pursuant to a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, the Court must accept as true all material allegations in the complaint and all reasonable factual inferences must be viewed in the light most favorable to the plaintiff. *Odd v. Malone, 538 F.3d 202, 205 (3d Cir.*

---

[3] Max Drive LLC is identified as the bill-to-customer and owner in service estimate and invoices that Plaintiffs have appended to the Complaint. ECF No.1-2 at 22-35.

[4] The Court notes that Plaintiffs submitted this document with several filing errors, including using the wrong case number in the caption. Counsel did not comply with this Court's directive on June 29, 2021 to resubmit his filing to correct these errors.

2008). The Court, however, need not accept bald assertions or inferences drawn by the plaintiff if they are unsupported by the facts set forth in the complaint. See Cal. Pub. Employees' Retirement Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)). Nor must the Court accept legal conclusions set forth as factual allegations. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. (citing Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)). Indeed, the United States Supreme Court has held that a **[*6]** complaint is properly dismissed under Fed. R. Civ. P. 12(b)(6) where it does not allege "enough facts to state a claim to relief that is plausible on its face," id. at 570, or where the factual content does not allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); see also Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (finding that, under Twombly, "labels, conclusions, and a formulaic recitation of the elements of a cause of action" do not suffice but, rather, the complaint "must allege facts suggestive of [the proscribed] conduct" and that are sufficient "to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s] of his claim").

## III. DISCUSSION

### A. Magnuson-Moss Warranty Act (Count I)

Plaintiffs bring Count I under the MMWA. The MMWA is "a remedial statute designed to protect the purchasers of consumer goods from deceptive warranty practices." Dzielak v. Whirlpool Corp., 26 F. Supp. 3d 304, 331 (D.N.J. 2014) (quoting Miller v. Willow Creek Homes, Inc., 249 F.3d 629, 630 (7th Cir. 2001)). Under this statute, "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation . . . under a written warranty, implied warranty, or service contract, may bring suit for damages and other equitable relief." 15 U.S.C. § 2310(d)(1). The MMWA only applies to claims involving "consumer **[*7]** products." Triad Charters, Inc. v. Viking Yacht Co., No. 88-4977, 1989 U.S. Dist. LEXIS 2433, 1989 WL 21763, at *3 (D.N.J. Mar. 6, 1989).

In support of the Motion to Dismiss, Murray's Freightliner argues Count I should be dismissed for two reasons: (1) the Vehicle is a tractor-trailer, which is not a "consumer product" subject to the MMWA; and (2) Plaintiffs fail to state a claim, because they do not identify any express warranty at issue, and they rely upon boilerplate allegations without factual support as to any alleged breach of implied warranty. ECF No. 7 at 3-5.

In response, Plaintiffs argue that their "use of the subject vehicle" qualifies it as a consumer product under the MMWA.[5] ECF No. 9 at 5-6. They contend that Garbutt registered the Vehicle under both his business and personal name, and therefore "[p]inning it as solely business use would be incorrect." Id. at 6. As to Murray's Freightliner's second argument, Plaintiffs argue they have stated a plausible claim, because there were "warrantable defects" in the product it sold, and Murray's Freightliner failed to repair the Vehicle properly.

### 1. The Vehicle is Not a Consumer Product under the MMWA

As to Murray's Freightliner's first argument, the Court agrees the Vehicle is not a consumer product subject to the MMWA. Under the MMWA, a consumer product **[*8]** is defined as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes . . . ." 15 U.S.C. § 2301(1).

Here, the product at issue is a 2016 Freightliner Cascadia, which is a commercial tractor-trailer. As other courts have found, tractor-trailers are not a product that is "normally used for personal, family or household purposes." See, e.g., Ligato v. Ryder Used Vehicle Sales, Inc., No. 19-2345, 2019 U.S. Dist. LEXIS 118066, 2019 WL 3202573, at *2 (E.D. Pa. July 16, 2019) (finding 2011 Freightliner Cascadia 125 was a "heavy truck," which did not qualify as a "consumer product" under the MMWA); Kwiatkowski v. Volvo Trucks N. Am., Inc., 500 F. Supp. 2d 875, 877 (N.D. Ill. 2007) ("The court agrees . . . that a commercial tractor-trailer is not ordinarily used for personal, family, or household use. The normal and ordinary purpose for

---

[5] The Court notes that Plaintiffs quote from 16 C.F.R. § 700.1(a) at length without using quotation marks or attributing the source of the authority. Counsel is reminded that proper citation to legal authority is required.

such trucks is to haul trailers in transport of goods and products over long distances for commercial benefit. Such a vehicle is not a 'consumer product' and therefore beyond the reach of the [MMWA].'"); Singtutt v. Paccar Inc., No. 1:14-cv-00134, 2015 U.S. Dist. LEXIS 6301, 2015 WL 251844, at *2 (E.D. Cal. Jan. 20, 2015) ("A tractor-trailer product is generally used for commercial purposes and is not within the coverage of the [MMWA].").

Although Plaintiffs argue *they* did not use the Vehicle solely for business use, this is not the relevant inquiry.[6] As Plaintiffs acknowledge in their **[*9]** Response, "the use to which a product is put by any individual buyer is not determinative" of whether it is a consumer product. ECF No. 9 at 5 (quoting 16 C.F.R. § 700.1(a)).[7] Instead, the Court looks to whether products of the type or class at issue are "normally used" for consumer purposes. Ligato, 2019 U.S. Dist. LEXIS 118066, 2019 WL 3202573, at *2; see also Triad Charters, Inc., 1989 U.S. Dist. LEXIS 2433, 1989 WL 21763, at *4 ("[H]ow a particular buyer uses the goods is irrelevant as long as the goods are 'normally used' for consumer purposes"); Mendelson v. Country Coach, Inc., No. 06-572, 2007 U.S. Dist. LEXIS 101946, 2007 WL 4812279, at *2 (C.D. Cal. Oct. 9, 2007) ("The broad policy of the [MMWA] and its regulations indicates that a 'type' or 'class' analysis of a product is the appropriate test in resolving the issue of coverage. An individual's deviation from the normal use of a particular type product will not affect its classification for purposes of the Act"). Here, Plaintiffs do not claim in their Complaint, or argue here, that the 2016 Freightliner Cascadia is the type of product which is "normally used" for consumer purposes. For these reasons, the Court finds the Vehicle is not a consumer product.

Because the MMWA applies only to warranties that pertain to consumer products and the truck at issue is not a consumer product, Plaintiffs fail to satisfy a requisite element of their claim. Accordingly, the Motion to Dismiss is granted on **[*10]** this basis.

## 2. Plaintiffs Do Not Plead Facts Establishing a Breach of Warranty

Second, Murray's Freightliner also argues that Plaintiffs' claim should be dismissed because they do not plead any underlying breach of warranty. The MMWA provides relief for consumers harmed by breaches of implied and express warranties. A "claim under the MMWA relies on the underlying state law claim." Johansson v. Cent. Garden & Pet Co., 804 F. Supp. 2d 257, 265 (D.N.J. 2011). "Thus, if there exists no actionable warranty claim, there can be no violation of the MMWA." Argabright v. Rheem Mfg. Co., 201 F. Supp. 3d 578, 600-01 (D.N.J. 2016) (citing Johansson, 804 F. Supp. 2d at 265; In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., No. 96-1814, 1997 U.S. Dist. LEXIS 24064, 2001 WL 1266317, at *24 (D.N.J. Sept. 30, 1997)).

Upon review, Plaintiffs do not sufficiently plead any underlying breach of warranty under state law. In order to state a claim for breach of express warranty, a plaintiff must allege: "(1) that the defendant made an affirmation of fact or description of its goods; (2) that the statement formed part of the basis of the bargain between the parties; and (3) that the product failed to conform with the affirmation or description." In re Shop-Vac Mktg. & Sales Practices Litig., 964 F. Supp. 2d 355, 362 (M.D. Pa. 2013).

In this case, Plaintiffs' Complaint lacks factual allegations to support the existence of a breach of express warranty. Although Plaintiffs vaguely aver that Murray's Freightliner issued various warranties in connection with Plaintiffs' purchase of the vehicle in 2015, they do **[*11]** not identify any specific affirmation or promise at issue, or the source of the express warranty. See ECF No. 1-2 ¶¶ 6-8.[8] This is insufficient to state a claim. See Kester v. Zimmer Holdings, Inc., No. 2:10-cv-00523, 2010 U.S. Dist. LEXIS 59869, 2010 WL 2696467, at *10-11 (W.D. Pa. June 16, 2010); see also Schiff v. Hurwitz, No. 12-cv-0264, 2012 U.S. Dist. LEXIS 70039, 2012 WL 1828035, at *6 (W.D. Pa. May 18, 2012) ("Absent a demonstration that a promise or

---

[6] Even if this was the relevant inquiry, the Court also notes there are no allegations in Plaintiffs' Complaint indicating the Vehicle was "normally used" by Plaintiffs for personal or household use. This is particularly true as to Max Drive LLC, which is a corporate entity.

[7] Plaintiffs rely upon this quoted excerpt from the implementing regulations for the MMWA without using quote marks to identify it as a quotation or citing to its source. Counsel is reminded that legal authority must be properly cited for the Court's reference.

[8] As Murray's Freightliner points out, the Complaint also does not reflect that Plaintiffs purchased the Vehicle from Murray's Freightliner. Although Plaintiffs purport to provide a "true and correct copy" of the purchase contract, as discussed, the only agreement attached is a lease purchase agreement dated 2019, to which Murray's Freightliner is not a party. Plaintiffs do not address this issue in their Response in opposition to the Motion to Dismiss.

affirmative statement was made, how or by whom the promise was made, and what was in fact promised, a claim for breach of express warranty is not sufficiently plead.") (citations omitted).

Plaintiffs do not clarify in their Response. Instead, Plaintiffs argue that Murray's Freightliner did not correct "issues resulting from the malfunction of the product they sold which were covered by Murray's applicable warranty," again, without identifying the source, nature, or content of this purported warranty. ECF No. 9 at 6. Although Plaintiffs broadly refer the Court to copies of repair orders from Murray's Freightliner, the Court cannot locate any purported written warranty in those documents. To the contrary, Murray's Freightliner issued the following disclaimer of warranties:

> The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, **[*12]** and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose . . . .

Id. at 29.

Plaintiffs also fail to plead facts in support of a claim for breach of any implied warranty. Under Pennsylvania law:

> Both the implied warranty of merchantability and the warranty of fitness for a particular purpose arise by operation of law and serve to protect buyers from loss where the goods purchased are below commercial standards or are unfit for the buyer's purpose. *Vlases v. Montgomery Ward & Co., 377 F.2d 846, 849 (3d Cir. 1967)*. In order to be merchantable, goods must be "fit for the ordinary purposes for which such goods are used." *13 Pa.C.S.A. § 2314(b)(3)*. The warranty of fitness for a particular purpose is more exacting. It requires that the seller had reason to know of the buyer's particular purpose at the time of contracting and that the buyer was relying on the seller's expertise. In that case, the goods are implicitly warranted to be fit for that particular purpose. *13 Pa.C.S.A. § 2315*. To establish a breach of either warranty, plaintiffs must show that the equipment they purchased from defendant was defective.

*Altronics of Bethlehem, Inc. v. Repco, Inc., 957 F.2d 1102, 1105 (3d Cir. 1992)*.

Plaintiffs' Complaint is devoid of factual allegations to support either claim. In Count I, Plaintiffs claim that Murray's Freightliner failed **[*13]** to comply with written warranties and make reasonable repairs. As a result of Murray's Freightliner's botched repair, Plaintiffs suffered damages. Plaintiffs do not plead facts demonstrating that the Vehicle, which required some repair five years after purchase, was supplied with defects.

As to the implied warranty of fitness for a particular purpose, Plaintiffs do not plead that Murray's Freightliner sold the Vehicle—let alone that Murray's Freightliner had reason to know of Plaintiffs' anticipated use of the Vehicle and that Plaintiffs relied upon its expertise. In their Complaint, Plaintiffs claim that Murray's Freightliner "manufactured and warranted" the Vehicle, and Murray's Freightliner is not a party to the alleged purchase contract on which Plaintiffs rely. Based on this, the Court finds Plaintiffs do not plead any underlying breach of warranty claim, and therefore do not state a claim under the MMWA. As a result, the Motion to Dismiss is granted as to Count I.

### B. Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count II)

Plaintiffs bring Count II under the UPTCPL. The UTPCPL is Pennsylvania's consumer protection law. *Commonwealth v. Chesapeake Energy Corp., 247 A.3d 934, 936 (Pa. 2021)*. It was "created to even the bargaining power **[*14]** between consumers and sellers in commercial transactions" and prohibits "unfair or deceptive acts or practices." Id. (quoting *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC, 648 Pa. 604, 194 A.3d 1010, 1023 (Pa. 2018)*); *73 P.S. § 201-3* (internal quotations omitted).

Under the UTPCPL, actions can be brought on behalf of the Commonwealth by the Attorney General or a District Attorney, or through a private cause of action. *Chesapeake Energy Corp., 247 A.3d at 937*. To bring a private cause of action under the UTPCPL, plaintiff must show that he "(1) purchased or leased goods or services primarily for a personal, family or household purpose; (2) suffered an ascertainable loss of money or property; and (3) the loss occurred as a result of the use or employment by a person of a method, act or practice declared unlawful by the UTPCPL." *Baynes v. George E. Mason Funeral Home, Inc., No. 09-153, 2011 U.S. Dist. LEXIS 59220, 2011 WL 2181469, at *4 (W.D. Pa. June 2, 2011)* (citing *73 P.S. § 201-9.2(a)*). In support, plaintiff must offer evidence of one of the statutorily delineated "unfair methods of competition" set forth in *73 P.S. § 201-2(4)*, or evidence that falls under the

"catch-all provision" found at 73 P.S. § 201-2(4)(xxi). Id.

In support of the Motion to Dismiss, Murray's Freightliner argues that Count II should be dismissed because Plaintiffs do not establish that they purchased or leased goods or services primarily for a personal, family or household purpose, as required to bring a private cause of action under 73 P.S. § 201-9.2(a). ECF No. **[*15]** 7 at 7.[9] In addition, Murray's Freightliner argues that Plaintiffs fail to state a UTPCPL claim because they do not specifically plead how Murray's Freightliner's actions or inactions allegedly violated the UTPCPL. Id. at 9-10.

In response, Plaintiffs concede that private causes of action under the UTPCPL must relate to goods purchased or leased primarily for personal, family or household purposes, and they do not claim to satisfy this requirement. ECF No. 9 at 7-8. However, they argue that the "substantive prohibitions and coverage sections" of this statute are not limited to consumers. Id. at 8. Plaintiffs assert that "many decision [sic] have recognized the UPTCPL [sic] covers business transactions," without citing to any legal authority in support. Id.

Plaintiffs also argue their UTPCPL claim is factually supported, referring the Court to allegations in their Complaint that Murray's Freightliner did not properly fix the Vehicle, and then falsely edited technicians' notes about the repair. Id. at 8-10. Plaintiffs contend that Murray's Freightliner engaged in "unfair or deceptive acts or practices" by failing to provide a product that "met the standard of goods they represented," and **[*16]** by making "fraudulent" and insufficient repairs. Id. at 10.

Upon review, the Motion to Dismiss is granted as to Count II. Because this is a private cause of action, Plaintiffs must show they purchased or leased goods or services at issue "primarily for personal, family or household purposes." Plaintiffs do not claim to meet this requirement with respect to the tractor-trailer at issue. Accordingly, Count II is dismissed.

## IV. CONCLUSION

For the foregoing reasons, the Motion to Dismiss, ECF No. 6, is granted. "If a complaint is vulnerable to Rule 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." Phillips v. Cty of Allegheny, 515 F.3d 224, 236 (3d Cir. 2008). Because the Court cannot conclude that Plaintiffs are unable to state any plausible claim arising out of the allegations in their Complaint, Plaintiffs will be permitted to amend their Complaint, as appropriate, within 14 days.

An Order will be entered.

Dated: August 10, 2021

BY THE COURT:

*/s/ Maureen P. Kelly*

MAUREEN P. KELLY

UNITED STATES MAGISTRATE JUDGE

## ORDER

AND NOW, this 10th day of August, 2021, IT IS HEREBY ORDERED that Defendant Murray's Freightliner's Motion to Dismiss, ECF No. 6, is GRANTED and Plaintiffs' claims are dismissed. Plaintiffs **[*17]** may amend their Complaint, on or before August 24, 2021, to the extent that Plaintiffs can correct the pleadings deficiencies identified in the accompanying Memorandum Opinion.

IT IS FURTHER ORDERED that, pursuant to *Rule 4(a)(1) of the Federal Rules of Appellate Procedure*, if any party wishes to appeal from this Order he or she must do so within thirty (30) days by filing a notice of appeal as provided in *Rule 3, Fed. R. App. P.*, with the Clerk of Court, United States District Court, 700 Grant Street, Room 3110, Pittsburgh, PA 15219.

BY THE COURT,

*/s/ Maureen P. Kelly*

MAUREEN P. KELLY

UNITED STATES MAGISTRATE JUDGE

**End of Document**

---

[9] Defendants also argued that Plaintiffs' UTPCPL claim should be dismissed because it is barred by the economic loss rule, but they have withdrawn this argument based upon the United States Court of Appeals for the Third Circuit's recent decision in *Earl v. NVR, Inc., 990 F.3d 310, 314 (3d Cir. 2021)*. ECF No. 7 at 8; ECF No. 10.

 Cited
As of: November 20, 2023 9:43 PM Z

## *Musto v. Sweeney*

United States District Court for the Middle District of Pennsylvania

September 26, 2022, Decided; September 26, 2022, Filed

Civil No. 3:21-CV-0966

**Reporter**
2022 U.S. Dist. LEXIS 174132 *; 130 A.F.T.R.2d (RIA) 2022-6076; 2022 WL 4472462

CHARLES MUSTO, DMD, Plaintiff, v. THOMAS SWEENEY, in his individual and official capacities, et al., Defendants.

### Core Terms

bookkeeper, dental practice, audit, motion to dismiss, records, individual defendant, tenants, rent payment, employees, receipts, asserts, deposit, special factor, allegations, collection, hesitation, documents, expenses, tracked, Counts, tax return, properties, remedies, taxpayer, Realty, malicious prosecution, amended complaint, official capacity, rental property, front office

**Counsel:** [*1] For Charles Musto, DMD, Plaintiff: Joseph P Guzzardo, LEAD ATTORNEY, Guzzardo & Associates, Joseph Guzzardo, Philadelphia, PA; Matthew Moroney, LEAD ATTORNEY, Goldberg, Miller & Rubin, P.C., Philadelphia, PA.

For Thomas Sweeney, In his individual and official capacities, Marie Grabinski, in her individual and official capacities, Alan C. Frevele, in his individual and official capacities, UNITED STATES OF AMERICA, Defendants: Emily K Miller, United States Department of Justice - Tax Division, Washington, DC; Gokce Tugce Yurekli, Tax, Washington, DC; Richard D Euliss, U.S. Attorney's Office, Harrisburg, PA; William J. Harrington, Tax, Civil Tax Division, Eastern Region, Washington, DC.

For Ben Wylam, in his individual and official capacities, Defendant: Gokce Tugce Yurekli, Tax, Washington, DC; Richard D Euliss, U.S. Attorney's Office, Harrisburg, PA; William J. Harrington, Tax, Civil Tax Division, Eastern Region, Washington, DC.

**Judges:** JENNIFER P. WILSON, United States District Judge.

**Opinion by:** JENNIFER P. WILSON

### Opinion

**MEMORANDUM**

This case involves several *Bivens*[1] claims against individual IRS agents, common law malicious prosecution and intentional infliction of emotional distress claims, as well as claims brought [*2] against the United States pursuant to the *Federal Tort Claims Act, 28 U.S.C. § 2671, et seq.* ("FTCA"). (Doc. 36.) The matter that gives rise to this lawsuit occurred when Plaintiff Charles Musto, DMD ("Musto") underwent a civil audit by the IRS, which he alleges the Government transformed into a criminal investigation after he invoked his *Fifth Amendment* right to remain silent during the course of his audit. (*Id.* ¶¶ 2-4.)

Before the court is Defendants' motion to dismiss, which seeks to dismiss the amended complaint in its entirety for failure to state a claim upon which relief can be granted and lack of subject matter jurisdiction. (Doc. 42.) For the reasons set forth below, Defendants' motion will be granted.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Musto opened and began operating his dental practice in Forty Fort, Pennsylvania in 1992. (Doc. 1, ¶¶ 22-23.) Having no prior business experience, Musto engaged an accountant named Thomas Melone ("Melone") in 1992, who advised Musto to structure his practice as a

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971)* (recognizing for the first time an implied private right of action for damages against federal officers alleged to have violated a citizen's constitutional rights).

sole proprietorship. (*Id.* ¶¶ 25-26.) Initially, all transactions were tracked manually on paper. (*Id.* ¶ 27.) In the late 1990s, Musto purchased and implemented a dental practice management software program called SoftDent to capture all business **[*3]** receipts. (*Id.*) SoftDent provided the front-office employees with a platform to electronically track and generate reports of dental procedures performed and insurance and customer payments, as well as billing and collection. (*Id.* ¶ 28.) SoftDent tracked and documented all of Musto's earned income. (*Id.*) Prior to purchasing SoftDent, Musto and Melone met with a sales representative from SoftDent to discuss the software's capabilities. (*Id.* ¶ 29.) The sales representative explained that SoftDent provided the accountant with an easier, more efficient means of tracking daily, monthly, and yearly transactions. (*Id.*) Melone later met with the SoftDent representative a second time to further discuss the software's capabilities and benefits. (*Id.*)

Musto himself did not receive training for SoftDent like his front office employees did, as they were entirely responsible for handling the bookkeeping and collections aspects of his dental practice. (*Id.* ¶¶ 30-31.) Musto's front office staff recorded all payments from patients, including cash payments, in the SoftDent system. (*Id.* ¶ 32.)

In or around 1995, Donna Kon ("Kon") approached Musto seeking employment and offering to engage in collection work **[*4]** for the dental practice, and Musto hired her. (*Id.* ¶ 34.) Over time, her job responsibilities increased, and Kon became the bookkeeper for Musto's dental practice (and later, for his real estate ventures). (*Id.* ¶ 35.) Kon also acted as Musto's personal assistant with respect to payment of outstanding invoices, including Musto's personal expenses such as his daughter's tuition payments. (*Id.* ¶ 36.) Musto expected Kon to properly account for such payments as personal, rather than business, expenses. (*Id.*)

Initially, prior to the implementation of SoftDent, Kon accounted for Musto's business receipts by tracking the deposits in Musto's business account. (*Id.* ¶ 37.) As Musto's practice grew and he implemented SoftDent, front office staff would print out daily SoftDent records and place a hard copy in a bin that Kon retrieved and was supposed to use to reconcile Musto's business receipts. (*Id.* ¶ 38.) Kon prepared and provided financial statements to Melone, which Musto believed incorporated the daily SoftDent records from his front office staff. (*Id.* ¶ 40.)

In addition to his dental practice, beginning in approximately 1994, Musto began purchasing various properties, acquiring the properties **[*5]** as sole proprietorships at Melone's advice. (*Id.* ¶¶ 43-44.) After purchasing a property on Welles Street in Forty Fort, Pennsylvania, Musto created a separate corporate entity in which he could title subsequent properties. (*Id.* ¶ 46.) Eventually, Musto owned a portfolio of properties that he rented to primarily commercial tenants, with a handful of residential tenants as well. (*Id.* ¶ 47.)

In the 2005 time period, Musto entered into a "50/50" partnership with Kon's husband, Michael Kon, to purchase an entity known as Tom Hart Realty, a realty management company. (*Id.* ¶ 48.) As part of Musto and Michael Kon's business arrangement, Michael Kon ran the day-to-day business operations of Musto's rental properties and collected some (but not all) of the rental payments from Musto's tenants. (*Id.* ¶ 49.) Other tenants mailed their rent payments directly to Musto's dental office. (*Id.*) Musto was a silent partner in Tom Hart Realty and he relied upon Michael Kon to manage the day-to-day affairs of the business. (*Id.* ¶ 51.) All physical and electronic records pertaining to the rental properties were in the possession of Donna Kon and her husband at the Tom Hart Realty office. (*Id.*) Around the same **[*6]** time, Donna Kon became responsible for the accounting of all income from Musto's rental properties in addition to her other responsibilities for Musto's dental practice. (*Id.* ¶ 52.) All of Musto's rental properties were reported on his tax returns. (*Id.* ¶ 53.) Most tenants made rental payments via check, and the general practice to account for the rental payments was to photocopy each check prior to its deposit and provide the photocopy to Kon, who entered the transaction into a Quickbooks ledger that she maintained. (*Id.* ¶ 54.)

On March 9, 2012, the Civil Examination Division of the IRS, by and through Defendant Thomas Sweeney ("Sweeney"), informed Musto that his 2010 personal tax return was subject to an audit. (*Id.* ¶ 55.) Upon learning of the audit, Musto contacted Melone, who advised that he could handle the audit on Musto's behalf. (*Id.* ¶ 56.) Melone told Musto that he would contact Sweeney, the IRS Examiner assigned to the matter, to schedule a meeting between the three of them. (*Id.* ¶ 57.) In preparation for the audit meeting, Musto discovered that Melone had not relied on any SoftDent reports to calculate the dental practice's income and instead only used bank deposit records **[*7]** that Donna Kon provided to him. (*Id.* ¶ 58.) Accordingly, Melone mistakenly relied upon and included only deposit records from the dental practice's original bank account

at Citizen's Bank to calculate the dental practice's income when preparing Musto's tax returns. (*Id.* ¶ 59.) Thus, without the SoftDent reports and the deposit records from Musto's other bank accounts, Musto's income was underreported. (*Id.* ¶ 60.) At Melone's instruction, Musto secured an extension to file that current year's tax return and terminated Melone's representation in connection with the audit. (*Id.* ¶¶ 61-63.)

Musto then hired Lisa Lori ("Lori") and Mark Cedrone ("Cedrone") as counsel to help him navigate the audit process. (*Id.* ¶ 64.) In April 2012, as counsel for Musto, Lori and Cedrone met with Melone and Donna Kon separately to discuss the upcoming audit. (*Id.* ¶ 65.) Prior to these meetings, it came to Musto's attention that Donna Kon had mischaracterized certain checks for the dental practice and realty company in the Quickbook entries she maintained. (*Id.* ¶ 66.) After the meetings, Musto was instructed to have his books and records reviewed for any mistakes and to remedy them. (*Id.* ¶ 67.)

In August 2012, **[*8]** Musto engaged a new accountant, Frank Pinnacoli ("Pinnacoli") to assist him with the audit. (*Id.* ¶ 68.) Upon Pinnacoli's advice, Musto paid approximately $500,000 to the IRS to satisfy any then-owed or future tax liability arising out of the bookkeeping errors discovered. (*Id.* ¶ 69.)

At the time of Musto's audit, Sweeney had only been employed by the IRS for approximately two years. (*Id.* ¶ 81.) Sweeney was trained to search for indicators of fraud, known as "badges," and to prepare a criminal referral for a Fraud Technical Advisor to review and approve if badges were found. (*Id.* ¶ 82.) Musto asserts that no fraud badges associated with income omission were present in Musto's case. (*Id.* ¶¶ 82-84.) Musto also contends that no fraud indicators relating to the conduct of a taxpayer were present in his case. (*Id.* ¶ 85.)

At least twice, Musto attempted to explain to Sweeney, through counsel, that all of his income was properly documented in SoftDent, but that his bookkeeper and accountant mistakenly failed to transfer this data from SoftDent to his returns, resulting in the underreporting of his income. (*Id.* ¶ 86.) Sweeney declined to meet with Musto's counsel to further discuss the issue **[*9]** and wanted to speak directly with Musto. (*Id.* ¶¶ 87-88.) Based on his attorney's advice, Musto declined to participate in an interview with Sweeney, invoking his *Fifth Amendment* right to remain silent and to only communicate through counsel. (*Id.* ¶¶ 89-90.)

In early March 2013, Sweeney made a referral report to the IRS Criminal Investigation Division stating that Musto should be subjected to criminal prosecution. (*Id.* ¶ 95.) On or about March 7, 2013, Defendant Alan Frevele ("Frevele"), a Fraud Technical Advisor with the IRS, discussed the case with Sweeney. (*Id.* ¶¶ 82, 98.) Frevele approved Sweeney's referral for criminal prosecution. (*Id.* ¶ 98.) Soon thereafter, Defendant Marie Grabinski ("Grabinski"), a Special Agent with the IRS, received the fraudulent referral report from Sweeney. (*Id.* ¶ 101.) On March 14, 2013, Grabinski met with Sweeney and Defendant Ben Wylam ("Wylam"), a Special Supervisory Agent with the IRS, to discuss Musto's case. (*Id.* ¶ 102.)

Assistant United States Attorney Lorna Graham ("AUSA Graham") was initially assigned to the investigation. (*Id.* ¶ 99.) AUSA Graham was assigned to the criminal investigation for 18 months and did not pursue criminal charges against Musto. (*Id.* ¶ **[*10]** 100.)

In addition to the documents Sweeney gave to her, Grabinski gathered documents via subpoena from Musto's financial institutions, Donna Kon, and Melone. (*Id.* ¶ 104.) Throughout the process of gathering documents, Grabinski communicated and acted in concert with Wylam, her supervisor. (*Id.* ¶ 105.) From March 2013 through the date of Musto's superseding indictment on June 21, 2016, Grabinski and Wylam interviewed prospective witnesses together, which included Donna Kon and some of Musto's front-office staff, who advised Grabsinki and Wylam of the SoftDent program. (*Id.* ¶ 106.)

In the Spring of 2014, another attorney from the United States Attorney's Office, Joseph Terz ("AUSA Terz"), contacted Cedrone to notify him that the United States Attorney's Office was still pursuing a criminal investigation. (*Id.* ¶ 108.) On or around June 13, 2014, Musto's counsel met with AUSA Terz and explained that the underreporting of income was due to Musto's good faith reliance on Donna Kon, his longtime bookkeeper, and Melone. (*Id.* ¶ 109.) Musto's counsel further explained that all earned income had been captured by SoftDent, but Melone had inadvertently not used or consulted the SoftDent reports when **[*11]** computing Musto's income for tax purposes. (*Id.* ¶ 110.) Following this meeting, AUSA Terz advised that the United States Attorney's Office decided not to prosecute the case against Musto because there was no evidence of willful omission of taxable income. (*Id.* ¶ 111.)

Two years later, in March 2016, a representative of the

United States Department of Justice, Tax Division, Criminal Section, contacted Musto's counsel to inform him that it would independently proceed with a criminal case against Musto for his 2009 tax return, not the 2010 return for which the audit took place. (*Id.* ¶ 112.) Grabinski and Wylam interviewed Donna Kon a second time on March 24, 2016. (*Id.* ¶ 113.) The Government provided Kon with a proffer statement providing that if she testified, the Government would not prosecute her. (*Id.* ¶ 115.)

During Kon's testimony before the Grand Jury on March 29, 2016, no questions were asked relating to the SoftDent records. (*Id.* ¶¶ 117-119.) Kon was asked about the bank receipts she used and whether she believed that constituted the entirety of the business receipts for Musto's dental practice. (*Id.* ¶ 118.) Additionally, Kon testified that she believes her statements and testimony **[*12]** have remained consistent throughout the multiple interviews, which Musto asserts is not accurate. (*Id.* ¶¶ 120-121.) Thus, Musto asserts that the Government suborned perjury from Kon in front of the Grand Jury. (*Id.* ¶ 117.)

On April 2, 2016, Musto's counsel met with DOJ Tax Counsel and attempted to offer SoftDent reports that captures all income the dental practice received, but DOJ Tax Counsel declined. (*Id.* ¶¶ 122-123.) On April 12, 2016, Musto was formally indicted on one count of filing a false tax return in violation of *26 U.S.C. § 7206(1)* for the year 2010. (*Id.* ¶ 124.) Musto contends that the indictment was not supported by probable cause because it was based on perjury and false evidence presented by the Government. (*Id.*)

In later depositions in a civil action Musto filed against Donna Kon and her husband, Donna Kon testified that there were many inconsistencies between what she told Grabinski and what Grabinski ultimately used to secure Musto's indictment, including a statement Kon allegedly made to Grabinski about Musto having foreign accounts. (*Id.* ¶¶ 127-128.)

On April 27, 2016, Grabinski submitted an affidavit in support of a search warrant application for properties associated with Musto. ( **[*13]** *Id.* ¶ 132.) Portions of the affidavit alleged:

> A. Musto and his wife failed to report income from their rental properties;
> B. Bookkeeper, Kon, was advised by Musto to "bury expenses" and reclassify expenses;
> C. Bookkeeper, Kon, advised Grabinski that she did not discuss any bookkeeping or accounting matters of Musto's with his accountant (Melone);
> D. Sweeney identified patient payments diverted to the Mustos' personal accounts;
> E. Bookkeeper, Kon, stated she never received any deposit information from Musto when he received rental payments personally. As a result, bookkeeper, Kon, stated she never entered those rental payments into Quickbooks;
> F. Bookkeeper, Kon, stated that Musto received cash payment from a commercial tenant renting garage space. Kon further stated she brought this to Musto's attention and he advised her that he had received the payments;
> G. Bookkeeper, Kon, stated that the Mustos did not report rental payments from the following properties: 921 Wyoming Ave, 1898 Wyoming Ave, the tenants above Tom Hart Realty and 413 Packer Ave;
> H. Bookkeeper, Kon, stated that personal expenses like the Mustos' children's automobile insurance, car payments, airplane hanger and pool expenses **[*14]** were expensed through the dental practice;
> I. "Partner One," later discovered to be Michael Kon, stated he supplied tenants with rental receipts when he occasionally accepted rent payments, but then turned them over to bookkeeper, Kon;
> J. "Partner One," later discovered to be Michael Kon, described Musto's large car collection;
> K. Grabinski alleged that the "only way to arrive at the true patient fees [from Musto's dental practice] would be from the SoftDent files located on the office computer system or from the reports that were by the front office employees and given to Musto on a daily and monthly basis";
> L. Grabinski alleged Musto must have kept track of the monies not being reported as he requested Melone to work up the tax consequences based on two income scenarios after the notice of a civil audit being pursued against him;
> M. Grabinski included as fact that Musto's [sic] maintained an extensive car collection;
> N. Grabinski included as fact that Musto is a licensed pilot who owned an airplane;
> O. Grabinski included as fact that the Mustos had stock market activity and accounts in foreign countries;
> P. Grabinski stated that Musto's wife assisted with the scheme to defraud the IRS; and **[*15]**
> Q. The affidavit described Musto as having provided separate receipts of his business accounts

to his bookkeeper and accountant, both of them were unknowingly assisting in his scheme to defraud the IRS.

(*Id.*, ¶ 133.)

In obtaining the search warrant(s), Grabinski did not disclose that "Partner One" was Michael Kon, who was, along with his wife, being accused of fraud and theft by the Mustos. (*Id.* ¶ 134.) Musto's uncle was the tenant at 413 Packer Avenue and Musto did not charge him any rent. (*Id.* ¶ 138.) As to the other tenant referenced in the affidavit, Musto alleges that the cash rent payments were made directly to Kon and her husband, whom he assumes stole the rent money. (*Id.* ¶ 139.) Kon later testified that she had no information on Musto having money in foreign accounts and never relayed this information to Grabinski. (*Id.* ¶ 140.)

Musto's criminal trial began on June 3, 2019. (*Id.* ¶ 142.) At trial, Musto explained that the underreporting of income was due to his reliance on his accountant and bookkeeper, who failed to document the income reported in SoftDent to his tax return. (*Id.* ¶ 143.) At trial, Musto established that if SoftDent reports were considered and incorporated by Kon **[*16]** and Melone, there would have been no or minimal underreporting on his tax returns. (*Id.* ¶ 144.) The Government's expert testified that once taking into account the SoftDent records, there were no issues with the accounting. (*Id.* ¶ 145.) The trial concluded June 13, 2019, and Musto was found not guilty. (*Id.* ¶ 7.)

Musto alleges that he did not willfully conceal his earned income and never had any knowledge, or reason to believe, that his reported income was incorrect. (*Id.* ¶¶ 72-73.) Musto's business maintained accounting records via SoftDent that accurately reported all of his earned income. (*Id.* ¶ 74.) Because the dental practice was a sole proprietorship, Musto contends that he was permitted to deposit business receipts in personal or business checking accounts. (*Id.* ¶ 76.) At all relevant times, Musto implemented accounting and bookkeeping measures by hiring professionals and installing appropriate software to ensure that income was accurately tracked and reported. (*Id.* ¶ 78.)

After his acquittal, Musto initiated this action by filing a complaint on May 27, 2021. (Doc. 1.) Defendants filed a motion to dismiss on October 25, 2021. Musto then filed an amended complaint on December 7, **[*17]** 2021. (Doc. 36.) The amended complaint is now the operative pleading in this case.

On January 11, 2022, the court approved Defendants' substitution of the United States as a party in place of Defendants Sweeney, Grabinski, Wylam, and Frevele (collectively, "the individual Defendants") with respect to the state law claims set forth in Counts IV and V of the Amended complaint, pursuant to *28 U.S.C. § 2679(d)*. (Doc. 41.) The same day, Defendants filed the instant motion to dismiss with an accompanying brief in support. (Docs. 42, 43.) Musto timely filed a brief in opposition on February 8, 2022. (Doc. 45.) Defendants then filed a reply brief on March 1, 2022. (Doc. 48.) With leave of the court, Musto filed a sur-reply brief on March 14, 2022. (Doc. 51.) Therefore, this motion is ripe for resolution.

**JURISDICTION**

This court has jurisdiction under *28 U.S.C. § 1331*, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States. In addition, this court has jurisdiction pursuant to *28 U.S.C. § 1332* because there is complete diversity between the Plaintiff and Defendants and Plaintiff asserts that the amount in controversy exceeds $75,000. The court has **[*18]** supplemental jurisdiction over the related state-law claims pursuant to *28 U.S.C. § 1367*. Further, venue is appropriate under *28 U.S.C. § 1391*.

**STANDARD OF REVIEW**

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly, 550 U.S. at 556*). "Conclusory allegations of liability are insufficient" to survive a motion to dismiss. *Garrett v. Wexford Health, 938 F.3d 69, 92 (3d Cir. 2019)* (quoting *Iqbal, 556 U.S. at 678-79*). To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give

rise to an entitlement to relief." *Bistrian v. Levi, 696 F.3d 352, 365 (3d Cir. 2012)*.

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. *Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2007)*. The court may also consider "undisputedly authentic document[s] that a defendant [*19] attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." *Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)*. Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." *Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002)*; see also *U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002)* (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss in one for summary judgment"). However, the court may not rely on other parts of the record in determining a motion to dismiss, or when determining whether a proposed amended complaint is futile because it fails to state a claim upon which relief may be granted. *Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994)*.

**DISCUSSION**

Musto's claims fall into two categories: (1) claims against the United States; and (2) *Bivens* claims against the individual Defendants. (Doc. 36.) Each category will be discussed in turn.

**A. Claims Against the United States — Counts IV, V, VII, and VIII**[2]

The United States was substituted as the defendant for Counts IV and V of the complaint—common law malicious prosecution and common law intentional [*20] infliction of emotional distress—under *28 U.S.C. § 2679(d)*, and those claims were dismissed with respect to the individual defendants. (Doc. 41.) Counts VII and VIII are counts of malicious prosecution and *Fifth Amendment* retaliation, brought against the United States pursuant to the FTCA. (Doc. 36, pp. 36-39.)[3]

First, Defendants argue that the four claims against the United States should be dismissed for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction, as the United States has not waived sovereign immunity. (Doc. 43, pp. 12-13.) Defendants contend that Musto cites no statute in which the United States has consented to suits of this kind and that it has explicitly withheld its consent in the FTCA. (*Id.* at 12.) Additionally, Defendants argue that the FTCA claims would be barred in any event by Musto's failure to exhaust his administrative remedies. (*Id.* at 13-15.)

Musto has provided no argument in opposition. Rather, he seems to concede these points, as he explicitly notes that that "for purposes of responding to Defendants' motion to dismiss, [Musto] will only address Defendants' arguments as to Counts I, III and VI." (Doc. 45, p. 4.) Thus, the court finds that Musto [*21] does not oppose dismissal of the claims against the United States. Indeed, absent a valid waiver, sovereign immunity shields the United States from suit. *FDIC v. Meyer, 510 U.S. 471, 475, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994)*. The United States has not waived sovereign immunity for constitutional claims. *United States v. Testan, 424 U.S. 392, 400-02, 96 S. Ct. 948, 47 L. Ed. 2d 114* (1976.) Therefore, the claims against the United States will be dismissed for lack of subject matter jurisdiction.

**B. Claims Against the Individual Defendants — Counts I, III, and VI**

**1. Official Capacity**

The claims against the individual Defendants are all *Bivens* claims. "*Bivens* is the short-hand name given to causes of action against federal officials for alleged constitutional violations." *Bistrian v. Levi, 912 F.3d 79, 88 (3d Cir. 2018)*. However, as discussed by Defendants, *Bivens* only authorizes suits against federal officials sued in their individual capacities, not in their official capacities. *FDIC, 510 U.S. at 485*; see also *Hafer v. Melo, 502 U.S. 21, 26, 112 S. Ct. 358, 116 L. Ed. 2d*

---

[2] The seven counts in the complaint are labeled I, III, IV, V, VI, VII, and VIII. (*See* Doc. 36.) In Musto's brief in opposition to the motion to dismiss, he indicates that Count II has been withdrawn. (Doc. 45, p. 4.)

[3] For ease of reference, the court utilizes the page numbers in the CM/ECF header.

301 (1991).

The court first notes that Musto names all of the Defendants in both their individual and official capacities, but does not specify within each count of the complaint in which capacity he is attempting to sue the individual Defendants. (*See* Doc. 36, pp. 1, 29-32, 35-36.) For this reason, Defendants argue at the outset that to the extent Musto is bringing his *Bivens* claims against the individual Defendants in their official **[*22]** capacities, the claims should be dismissed. (Doc. 43, p. 15.)

Again, Musto offers no argument to the contrary, only asserting that he has alleged viable *Bivens* claims "against the individual Defendants *in their individual capacities*." (Doc. 45, p. 2) (emphasis added). Therefore, to the extent the *Bivens* claims are being brought against the individual Defendants in their official capacities, the claims will be dismissed with prejudice.

**2. Individual Capacity**

In the case giving the *Bivens* doctrine its name, the Supreme Court held that there is a cause of action for damages when a federal agent, acting under color of his authority, conducts an unreasonable search and seizure in violation of the Fourth Amendment. *Bivens, 403 U.S. at 397*. To date, the Supreme Court has only recognized a *Bivens* remedy in the context of the Fourth, Fifth, and Eighth Amendments. *See Bivens, 403 U.S. 388* (Fourth Amendment prohibition against unreasonable searches and seizures); *Davis v. Passman, 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979)* (Fifth Amendment gender-discrimination in the employment context); *Carlson v. Green, 446 U.S. 14, 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980)* (Eighth Amendment Cruel and Unusual Punishment Clause for failure to provide an inmate adequate medical treatment).

The Supreme Court cautioned against expanding *Bivens* beyond the three established circumstances where it has formally acknowledged the availability of a *Bivens* remedy. *Ziglar v. Abbasi, 137 S. Ct. 1843, 1857, 198 L. Ed. 2d 290 (2017)* ("[E]xpanding the *Bivens* remedy is now a disfavored judicial activity" and clarifying that "a *Bivens* **[*23]** remedy will not be available if there are special factors counselling hesitation in the absence of affirmative action by Congress.") (internal citation and quotation marks omitted).

Post-*Ziglar*, courts must apply a two-part test to determine whether a claim for relief expands the *Bivens* remedy to a new context or category of defendants. *Id. at 1849*. First, a court must determine if the *Bivens* claim presents a new context. *Mack v. Yost, 968 F.3d 311, 317 (3d Cir. 2020)*. The context is new if it is different in a "meaningful" way from the three established *Bivens* cases. *Ziglar, 137 S. Ct. at 1849*. "Meaningful" differences can be based on:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id. at 1859-60*; *see also Mack, 968 F.3d at 320* ("[T]he 'proper test' for determining whether a case presents a new *Bivens* context is if the Supreme Court has not previously recognized a claim in that context. A context **[*24]** is 'new' if it implicates a constitutional right not previously recognized by the Supreme Court.") (internal citations omitted). Second, if the case presents a new context, the court must consider whether "special factors counselling hesitation" against extending *Bivens* into this area exist "in the absence of affirmative action by Congress." *Id. at 1857*. "[T]he inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id. at 1858*. "[I]f there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy," then the Judiciary should defer and allow Congress to play its proper role. *Id. at 1858*.

This analysis requires the court to assess the impact on governmental operations system-wide, including the burdens on government employees who are sued personally, as well as the projected cost and consequences to the government itself. *Id.* Additionally, "the existence of alternative remedies usually precludes a court from authorizing a *Bivens* action." *Id., 137 S. Ct. at 1865*.

The threshold question in this matter is whether Musto's claims present a new context for *Bivens* actions or whether allowing **[*25]** the claims to proceed would

involve expanding *Bivens* in a meaningful way. On this point, the parties disagree. Defendants argue that on their face, the three *Bivens* claims asserted in this action—malicious prosecution under the *Fourth Amendment*[4] at Count I; conspiracy to violate Musto's civil rights pursuant to the *Fourth*, *Fifth*, and *Fourteenth Amendments* at Count III; and *Fifth Amendment* retaliation at Count VI—present new contexts. (Doc. 43, pp. 17-18.)

In contrast, Musto contends that none of his three *Bivens* claims present new contexts. As to the *Fourth Amendment* malicious prosecution claim, Musto asserts that "[t]he courts of this Circuit have already conducted this analysis and have provided a *Bivens* remedy against federal law enforcement officers for malicious prosecution in violation of the *Fourth Amendment*." (Doc. 45, p. 12.) Musto also asserts that "[t]his case concerns allegations of federal law enforcement officers (here IRS law enforcement officers) violating Musto's *Fourth Amendment* rights in the context of a malicious prosecution claim, conduct which many Federal Courts, including those in this District, have found to fall within *Bivens*'s intended ambit." (*Id.* p. 17.)

Despite Musto's confident assertions, he has failed to cite any case law to support the proposition that any courts, let alone courts within this **[*26]** District or Circuit, have allowed a *Bivens* claim for malicious prosecution under the *Fourth Amendment* to proceed. Post-*Ziglar*, the Third Circuit Court of Appeals has held that the "recognition of a cause of action under a constitutional amendment does not mean that such an action can vindicate every violation of the rights afforded by that particular amendment." *Vanderklok v. United States 868 F.3d 189, 199 (3d Cir. 2017)*. That is the case here. Musto's complaint raises *Bivens* claims under both the *Fourth* and *Fifth Amendments*, but they are not the same as those raised in *Bivens* for an unreasonable search or seizure or *Davis* for gender discrimination. Therefore, both of these claims, in addition to the civil conspiracy *Bivens* claim, clearly present meaningfully different *Bivens* contexts.

The court must now consider whether there are "special factors counselling hesitation" against extending *Bivens* into these areas. Defendants argue that there several remedial structures in place that collectively counsel hesitation in expanding a *Bivens* action in the IRS context: *26 U.S.C. § 7433* (allows a taxpayer to bring a civil action for damages against IRS employees in connection with any collection activity); the Treasurer Inspector General for Tax Administration (an entity separate from the IRS, with responsibility for investigating misconduct by IRS employees); **[*27]** the "Taxpayer Bill of Rights" (provides for the termination of any IRS employee for violation the Internal Revenue Code or any IRS policies "for the purpose of retaliating against, or harassing, a taxpayer or taxpayer representative); and the FTCA (provides a mechanism to deal with torts committed by federal employees acting within the scope of their employment). (Doc. 43, pp. 19-20.)[5] In response, Musto distinguishes the cases cited by Defendants and notes that the existence of an FTCA remedy does not itself foreclose an analogous remedy under *Bivens*. (Doc. 51, p. 3.)

While it is true that the availability of an FTCA remedy does not, on its own, foreclose a *Bivens* remedy, the Supreme Court's hesitance to extend *Bivens* is especially apparent in cases involving complex statutory schemes in which Congress has considered and created meaningful avenues for redress. *See Bush v. Lucas, 462 U.S. 367, 368, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983)* (refusing to find an implied *Bivens* remedy for federal employees alleging that supervisors violated their *First Amendment* rights because the claims arose out of a "relationship . . . governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States"); *see also Schweiker v. Chilicky, 487 U.S. 412, 414, 108 S. Ct. 2460, 101 L. Ed. 2d 370 (1988)* (declining to find an implied *Bivens* remedy for claimants **[*28]** whose Social Security disability benefits had been improperly terminated given the "elaborate remedial scheme devised by Congress" to deal with the improper denial or termination of disability benefits). The Court has clarified that

> the concept of "special factors counseling hesitation in the absence of affirmative action by Congress" has proved to include an appropriate judicial deference to indications that congressional inaction

---

[4] Count I of the complaint raises a claim for malicious prosecution pursuant to the Fourth, Fifth, and Fourteenth Amendments. Defendants argue that if it exists at all, a constitutional right to be free from malicious prosecution exists only under the Fourth Amendment. (Doc. 43, p. 23.)

[5] Defendants argue that alternatively, the individual Defendants are entitled to qualified immunity from the *Bivens* claims against them. (Doc. 43, pp. 21-24.) Because the court finds that the availability of a Bivens remedy is dispositive, it need not address the qualified immunity arguments.

has not been inadvertent. When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.

*Schweiker, 487 U.S. at 423*. This is true even if Congress has failed to provide for "complete relief," because the existence of such a statutory scheme demonstrates that Congress provided some "meaningful safeguards or remedies." *Id. at 425*.

It is clear that Congress has provided meaningful safeguards or remedies for aggrieved taxpayers to bring complaints against IRS agents who may have wronged them. Although the statutory schemes may not provide for complete relief, it is apparent that there has been affirmative action by **[*29]** Congress in this area. In light of this special factor counseling hesitation, the court will not extend the *Bivens* remedy to these new contexts, and Musto's claims will be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the court concludes that the *Bivens* claims against the individual Defendants present new contexts and that a special factor counsels against extending the *Bivens* remedy to these new contexts. Additionally, the court concludes that it does not have jurisdiction over the claims against the United States because the United States has not waived its immunity. Therefore, the court will grant Defendants' motion to dismiss. (Doc. 42.) Plaintiff will not be permitted to amend his complaint, as any curative action would be futile. An appropriate order follows.

/s/ Jennifer P. Wilson

JENNIFER P. WILSON

United States District Court Judge

Middle District of Pennsylvania

Dated: September 26, 2022

## ORDER

**AND NOW**, on this 26th day of September, 2022, in accordance with the accompanying memorandum, **IT IS ORDERED THAT** Defendants' motion to dismiss, Doc. 42, is **GRANTED WITH PREJUDICE**. The Clerk of Court is directed to close this case.

/s/ Jennifer P. Wilson

JENNIFER P. WILSON

United States District **[*30]** Court Judge

Middle District of Pennsylvania

**End of Document**

Michael Winfield